28 STATE STREET
BOSTON, MASSACHUSETTS 02109-1775
617 345-9000
FAX: 617 345-9020

HINCKLEY, ALLEN & SNYDER LLP
*Attorneys at Law*

**Lawrence W. Vernaglia**

September 30, 2002

**VIA FEDERAL EXPRESS**

Steven R. Kirsh, Director
Division of Jurisdiction & Case Management
Provider Reimbursement Review Board
2520 Lord Baltimore Drive, Suite L
Baltimore, MD 21244-2670

Re: Rhode Island Hospital, Providence, Rhode Island
Provider No.: 41-0007
FYE: 9/30/99
PRRB Case No.: 02-0763
Final Position Paper

Dear Ann:

Enclosed please find the Final Position Paper of the Provider with respect to the above-referenced appeal.

Please call me if you have any questions.

Very truly yours,

Lawrence Vernaglia

LWV/kl
Enclosure

cc: Stephen M. Coco (w/o enc.)
Kenneth Stafford (w/o enc.)
Richard Nagy (w/o enc.)
Thomas Pearson (w/o enc.)

**BEFORE THE PROVIDER REIMBURSEMENT REVIEW BOARD**

| | | |
|---|---|---|
| RHODE ISLAND HOSPITAL<br>Provider No. 41-0007,<br>Provider,<br><br>vs.<br><br>BLUE CROSS/BLUE SHIELD<br>ASSOCIATION<br>BLUE CROSS/BLUE SHIELD<br>OF RHODE ISLAND,<br>Intermediary. | ) | PRRB Case No. 02-0763<br>FYE: 9/30/99 |

PROVIDER'S FINAL POSITION PAPER

Submitted by:
Counsel for Rhode Island Hospital,

Lawrence W. Vernaglia, Esq.
HINCKLEY, ALLEN & SNYDER LLP
28 State Street
Boston, Massachusetts 02109
Tel: (617) 345-9000
Fax: (617) 345-9020

TABLE OF CONTENTS

I. INTRODUCTION ..... 1

1. Issues in Dispute. ..... 1

II. ARGUMENTS ..... 3

1. Issues 1 & 2, DSH Issues ..... 3

A. Days included in the DSH calculation for patients who received and/or were eligible for medical assistance under a State plan approved by Title XIX of the Social Security Act. ..... 4

2. Days associated with patients entitled to both Medicare part A and SSI (i.e., the SSI percentage). ..... 6

3. Issue Number 3 – Disallowance of the Costs of Physician Assistants ..... 8

A. The Provider is entitled to be reimbursed for the costs of physician assistants so long as the Provider does not bill Part B for the same services ..... 8

B. The Provider's position is supported by specific advice from HCFA, and the Fiscal Intermediary must be bound by HCFA instructions ..... 10

C. Other providers in Region I are reimbursed for the costs of physician assistants and the Provider should be treated similarly ..... 11

D. The Fiscal Intermediary's objections to the Provider's costs are not based on any express requirement in Medicare law, regulation or policy ..... 12

E. Section 4512 of the Balanced Budged Act supports the Provider's argument that Congress assumed Part A cost reimbursement was available for PA costs ..... 15

F. The Intermediary's disallowance of PA costs should be reversed ..... 16

4. Issues Numbered 4 & 5 - IME and GME Count ..... 17

5. Issue No. 6 - Reimbursed Salaries. ..... 22

6. Issue No. 7 – Managed Care Billing. ..... 25

7. Issue No. 8 – Psychology Interns. ..... 27

III. CONCLUSION ..... 27

TABLE OF AUTHORITIES ..... 29

TABLE OF EXHIBITS ..... 31



#373299.2
9/30/2002

## I. INTRODUCTION.

This document comprises the Final Position Paper of Rhode Island Hospital, Provider No. 41-0007, (the "Provider") in connection with Provider Reimbursement Review Board Case No. 02-0763, relating to the Provider's fiscal year ending September 30, 1999. Rhode Island Hospital is a 719-bed tertiary care hospital located in Providence, Rhode Island.

### 1. Issues in Dispute.

The issues addressed herein as set forth in the hearing request submitted by the Provider to the Provider Reimbursement Review Board and filed 2/14/02 are as follows:

| Issue Number: | Issue Protested: |
|---|---|
| 1. | Days included in the DSH calculation for patients who received and/or were eligible for medical assistance under a State plan approved by Title XIX of the Social Security Act. (Group Appeal Status Requested). |
| 2. | Days associated with patients entitled to both Medicare part A and SSI (i.e., the SSI percentage). (Group Appeal Status Requested). |
| 3. | Self-disallowance of the costs of Physician Assistants |
| 4. | Calculation of the GME Count |
| 5. | Calculation of the IME Count |
| 6. | Reimbursed Salaries should be offset on W/S A-8 and not W/S A-6 transferred to nonreimbursable department. |
| 7. | Managed Care Billing needs to be updated |
| 8. | Psychology Interns - Withdrawn. |



#399817.1

The Provider's Issues No. 1 and 2 were appealed with the Provider's individual appeal. The Provider has requested group appeal treatment for these issues, as per prior Board orders. These issues are: (1) Days included in the DSH calculation for patients who received and/or were eligible for medical assistance under a State plan approved by Title XIX of the Social Security Act; and (2) Days associated with patients entitled to both Medicare Part A and SSI (i.e. the SSI percentage). The two issues are referred to herein collectively as the "disproportionate share hospital" or "DSH" issues. The Board has previously instructed the Provider to submit these issues to group appeal treatment for these issues, and the Provider has requested that the Board accept the issues as such.

The Provider has, subsequent to the preparation of the Preliminary Position Paper in the above-captioned action, engaged the Fiscal Intermediary in administrative resolution negotiations regarding the DSH Issues. The Provider understands that a number of other similarly situated providers have done so this summer, as well. Consequently, the Provider is not briefing the DSH Issues in this position paper in order to resolve these issues before the Board in the instant appeal, rather than the group appeal format. To the extent that this requires a formal request to remove the DSH Issues from the respective group appeals, and restore them to the Provider's instant appeal, than this position paper stands for such notice and request to move issues. The Provider reserves the right to have the DSH Issues resolved by the Board by whatever process is jurisdictionally and administratively most convenient and expeditious, and that is the purpose for addressing the DSH Issues herein.

## II. ARGUMENTS.

The Provider restates the issues raised in Section I hereto. With respect to these issues, the Provider makes the following arguments.

### 1. Issues 1 & 2, DSH Issues.

As addressed above, the Provider has engaged a consultant, Southwest Consulting Associates of Plano, Texas ("Southwest") to assist the Provider in reviewing its disproportionate share hospital ("DHS") reimbursement. Southwest and the Provider submitted, on June 14, 2002, a comprehensive set of data to the Fiscal Intermediary in the expectation of resolving the DSH Issues administratively. This information is voluminous, and required submission in electronic media. These data are not susceptible to presentation in a written submission to the Board. Rather, the Provider summarizes the conclusions drawn and offers relevant factual evidence herein. However, the presentation of these data is more susceptible to oral testimony at Hearing. The Provider shall offer the testimony of agents of the Provider, and the consultants from Southwest who compiled the information from governmental sources, and from the Provider's records, to further support the arguments made herein.

In order to preserve the Provider's rights to protest the DSH Issues before the Board and, if need be, to receive judicial review, the Provider argues and briefs these issues herein.



#399817.1

The total additional DSH reimbursement demanded by the Provider for FYE 9/30/99 is $1,820,640. In addition, the Provider demands an adjustment to the capital DSH to reflect the allowable Medicaid days.

**A. Days included in the DSH calculation for patients who received and/or were eligible for medical assistance under a State plan approved by Title XIX of the Social Security Act.**

The calculation of additional reimbursement due to the Provider based on Southwest's analysis, provided to the Fiscal Intermediary previously, is set forth as follows:

| | | | |
|---|---|---|---|
| SSI Percentage | | 10.71% | Exhibit 1 |
| Total days eligible for medical assistance under a state plan approved under Title XIX and/or per PMI A-99-62 | 28,971 | | Exhibit 2 |
| Total Days | 158,769 | | Exhibit 3 |
| Medicaid Percentage | | 18.25% | |
| Disproportionate Patient Percentage (DPP) | | 28.96% | |
| For Urban Hospitals: If DPP>20.20% the DSH Factor Equals | | 12.85% | Exhibit 4 |
| DRG Payments occurring between Oct. 1 and Jan. 1 | | 15,810,703 | |
| DRG Payments occurring on or after Jan. 1 | | 43,312,522 | Exhibit 5 |
| Total DRG Payments other than Outlier payments | | 59,123,225 | |
| Calculated Disproportionate Share Payment | | 7,597,334 | |
| Amount Per Cost Report | | 5,776,694 | Exhibit 5 |
| DSH Due RHODE ISLAND HOSPITAL | | $1,820,640 | |

The total days eligible for medical assistance under a state plan approved under Title XIX and/or per PMI A-99-62 is 28,971. This calculation is broken down as follows:

| | | |
|---|---|---|
| Paid Medicaid days per state RA's | 14,567 | Exhibit 2A, Column C[1] |
| Paid days per state RA's with state funded codes | 42 | Exhibit 2A, Column D |
| Medicaid eligible days per Rhode Island | 6,475 | Exhibit 2B, Column C |
| Days eligible per PMI A-99-62 with stated funded codes | 65 | Exhibit 2B, Column D |
| Medicaid eligible days per Massachusetts | 2,254 | Exhibit 2C, Column C |
| Medicaid eligible days as a result of Massachusetts state waiver | 1,021 | Exhibit 2C, Column D |
| Days eligible per PMI A-99-62 with Mass. Stated funded codes | 5 | Exhibit 2C, Column E |
| Medicaid HMO days | 3,982 | Exhibit 2D, Column C |
| Medicaid HMO days with state funded codes | 13 | Exhibit 2D, Column D |
| Medicaid eligible patients > 64 years old | 94 | Exhibit 2E, Column C |
| Medicaid eligible days beyond paid days | 453 | Exhibit 2F, Column C |
| Total days eligible for medical assistance under a state plan approved under Title XIX and/or per PMI A-99-62 | 28,971 | |

A spreadsheet of all patient stays subject to this request is attached hereto as Provider Exhibit ("P-____") 1. In order to protect the confidentiality of the patients, the Provider has redacted all but the first two (2) letters of each patient's last name, and all but the first three (3) numbers of each patient's social security number ("SSN"). As the Fiscal Intermediary has the complete and unredacted file, if the Fiscal Intermediary seeks to compare the information submitted at P-1 with that provided directly, it can do so with ease. If the Board so requests, the unredacted file can be provided at Hearing. However, the Provider does not believe such additional information is required.

[1] Exhibit references are to hearing exhibits, which the Fiscal Intermediary has received under separate cover.

Finally, the Adjusted DSH Factor is calculated as follows:

| | |
|---|---|
| Disproportionate Share Percentage | 28.96% |
| Federal Threshold | 20.20% |
| Sub-total | 8.76% |
| Federal Multiplier | 0.825 |
| Sub-total | 7.23% |
| Federal Add-on | 5.88% |
| DSH Factor | 13.11% |

| | | |
|---|---|---|
| **Months for BBA Reduction** | 0 | 12 |
| Percentage of Fiscal Year | 0.00% | 100.00% |
| BBA Reduction Factor | 0.00% | 2.00% |
| Sub-total | 0.00% | 2.00% |
| Total BBA Reduction Factor | | 2.00% |
| DSH Factor | | 13.11% |
| BBA Adjustment Factor | | 98.00% |
| Adjusted DSH Factor | | 12.85% |

In light of the volume of data reviewed in completing the analysis, Southwest and the Provider shall call witnesses (both expert and fact) to demonstrate the calculations. The Provider is aware that the Board has processed many similar DSH cases in which Southwest has provided similar data. The Provider, therefore, requests the Board permit additional latitude in reviewing these submissions.

**2. Days associated with patients entitled to both Medicare part A and SSI (i.e., the SSI percentage).**

The Medicare statute provides an additional payment to hospitals that serve a disproportionate share of low-income patients. Section 1886(d)(5)(F) of the Act. Whether a hospital qualifies as a DSH, and the amount of the DSH payment, are based upon a hospital's "disproportionate patient percentage." Section 1886(d)(5)(F)(v) of the Act. The term "disproportionate patient percentage" is defined in Section 1886(d)(5)(F)(vi) of the Act as the sum of two fractions.

The first fraction is commonly known as the Medicare fraction. It is defined as

> the fraction (expressed as a percentage), the numerator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were entitled to benefits under Part A of this title and were entitled to supplemental security income benefits (excluding any State supplementation) under title XVI of this Act, and the denominator of which is the number of such hospital's patient days for such period which were made up of patient's who (for such days) were entitled to benefits under Part A of this title...

Section 1886(d)(5)(F)(vi)(I) of the Act.

The second fraction is commonly known as the Medicaid fraction. It is defined as:

> the fraction (expressed as a percentage), the numerator of which is the number of hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under title XIX [the Medicaid program], but who were not entitled to benefits under Part A of this title, and the denominator of which is the total number of the hospital's patient days for such period.

Section 1886(d)(5)(F)(vi)(II) of the Act.

The Provider contends that the Health Care Financing Administration ("HCFA")[2] and/or its Fiscal Intermediary have miscomputed both fractions that make up the Provider's disproportionate patient percentage. The effect has been to significantly underpay the Provider for the DSH adjustment.

CMS calculates the patient days in the numerator of the Medicare fraction, i.e., patient days attributable to patients who qualify both for Medicare Part A and for supplement security income (SSI). The Provider contends that CMS has used flawed and incomplete data to calculate the numerator in the fraction. If necessary, the Provider will request that the Board issue a subpoena to compel CMS to produce the data relating to its determination of the Provider's number of patient days attributable to patients who were eligible for Medicare Part A days and SSI during their stays at the Provider in fiscal year 1996. The Provider will submit the documentation showing errors and inaccuracies in the CMS's computation to the Intermediary and the Board in advance of the Hearing, and it will present as oral testimony the same.

**3. Issue Number 3 – Disallowance of the Costs of Physician Assistants**

**A. The Provider is entitled to be reimbursed for the costs of physician assistants so long as the Provider does not bill Part B for the same services.**

The Intermediary has disallowed the costs incurred by the Provider relating to services performed by physician assistants ("PAs"). The basis for the Intermediary's disallowance is that it believes that all PA services *must* be reimbursed under Part B of

[2] In July 2001, the name of HCFA was changed to the Centers for Medicare and Medicaid Services ("CMS"). In this document, the Provider shall use the terms HCFA and CMS to represent the same agency.

the Medicare program, and that such costs may not be reimbursed under Part A. The Intermediary has provided no regulatory authority for this position, other than general provisions that *permit* PAs to bill under Part B. Moreover, the Provider sought and received clarification from the CMS confirming the core of the Provider's interpretation.

The Provider does not dispute that PA services *may* be reimbursed under Part B, particularly after the amendments made by § 4512 of the Balanced Budget Act of 1997, Pub. L. No. 105-33 (August 5, 1997) ("BBA"), which was effective on January 1, 1998, after the start of the fiscal year in question.[3] However, the Provider vigorously disputes that the Medicare Act *prohibits* a provider from including the costs of PAs in its cost report as Part A reimbursable costs, so long as the provider and the PA do not also bill Part B. The Intermediary has produced no statute, regulation, or manual provision to indicate that the Provider's position is incorrect. To the contrary, Medicare law and regulations are clear that:

> Reasonable cost includes *all necessary and proper expenses incurred in furnishing services*, such as administrative costs, maintenance costs, and premium payments for employee health and pension plans. It includes both direct and indirect costs and normal standby costs. However, if the provider's operating costs include amounts not related to patient care, ***specifically not reimbursable*** under the program, or flowing from the provision of luxury items or services (that is, those items or services substantially in excess of or more expensive than those generally considered necessary for the provision of needed health services), such amounts will not be allowable.

42 C.F.R. 413.9(c)(3) (emphasis added). It is not disputed by the Intermediary that the costs of physician assistants are not "specifically not reimbursable under the program." The Provider assumes that the Intermediary does not dispute that the PA services were

---

[3] The Provider asserts that the changes made by Section 4512 support the Provider's position, as discussed in Section 2., E., *infra*.

related to patient care and were not luxury services. Therefore, under section 413.9, the costs of the PAs should be considered reasonable costs to the Provider and reimbursed accordingly.

**B. The Provider's position is supported by specific advice from HCFA, and the Fiscal Intermediary must be bound by HCFA instructions.**

The Provider's representatives confirmed the Provider's position with the Health Care Financing Administration's Center for Health Plans and Policy, Division of Practitioner and Ambulatory Care. The Agency confirmed that the Provider's position is correct – the costs of PAs may be billed under Part A to the Fiscal Intermediary. *See* Confirmatory letter of Lawrence W. Vernaglia, March 28, 2000, P-2; Response of Terrence L. Kay, April 7, 2000, P-3.[4] A hospital has the option of submitting bills for covered services to the Part B carrier for PA services *or* costs of the PAs to the Part A fiscal intermediary, so long as the provider does not do both. In a follow-up letter from Mr. Kay, he again confirmed "we continue to require the employer of a PA to bill the carrier for Part B services ***only if the PA has elected to obtain his/her own individual number***." (emphasis added; P-4). (P-3 and P-4 shall be referred to herein collectively as the "Kay Letters").

Thus, HCFA (now CMS) has advised the Provider authoritatively that if the PA does not have a billing number assigned to him or her, that the Provider must bill Part B

[4] The Provider notes that Mr. Kay's letter suggests that providers *must* bill the Part B carrier for the services of physician assistants "once the PA does obtain the [Medicare supplier billing] number," but that "it is true that no statute, regulation, or manual provision currently requires an eligible PA to obtain his/her own provider [sic] number." The Provider disputes the position that if a PA receives a supplier number that his/her services must be billed to Part B.

"only if" the Provider receives a billing number for the PA. In all other cases, these costs are properly reimbursable on the Provider's cost report. Based on the best information available to the Provider, no billing number was assigned to any PA during FYE 9/30/99. The Intermediary must comply with CMS's (then HCFA's) instructions and reimburse the Provider for the costs of those PAs. The Intermediary must be estopped from taking a position contrary to that of CMS.

The Provider argues that if the Provider does not elect to bill the services of the PA under Part B, that the Provider may report the costs of the PA for Part A reimbursement.

**C. Other providers in Region I are reimbursed for the costs of physician assistants and the Provider should be treated similarly.**

The Provider understands that at least two other hospitals in Region I, University of Massachusetts Medical Center and Memorial Hospital in Worcester, are reimbursed under Part A for the costs of PAs. In addition, the Provider's counsel, on information and belief, has reason to understand that there are several other Medicare certified hospitals in Region I that also received Part A reimbursement for their PA services.

It is arbitrary, capricious, and an abuse of discretion for the Program to reimburse one hospital, but deny to another, the costs of identical services. The Provider submitted a Freedom of Information Act request to the Regional Office on June 21, 2000 to confirm the Provider's and the Provider's counsel's information as to the other providers reimbursed for PAs in Region I. (See P-5). The Provider has not received a response as of this submission – more than two years later.

**D. The Fiscal Intermediary's objections to the Provider's costs are not based on any express requirement in Medicare law, regulation or policy.**

The Fiscal Intermediary has produced no express statement of law, regulation or policy to support its contention that the costs of PAs may not be reimbursed under Part A. The Response of Terrence L. Kay confirms that the Intermediary could not produce such a rule. P-3. Subsequent to audit, the Fiscal Intermediary raised several oblique challenges to the Provider's position. None of these challenges include a single argument that demonstrates that the agency requires PA services to be reimbursed only under Part B. The Provider responds to the Intermediary's specific challenges as follows.

:

The Provider is aware that the Kay Letters state that Part B reimbursement is only required if the PA has a billing number assigned to him or her. In one other case protested by a Rhode Island Medicare provider – not the instant provider – of which the Provider is aware, the Intermediary, subsequent to audit, identified a single physician assistant who had a billing number assigned to him, which number was unknown to the provider in question. The Fiscal Intermediary did not, on audit of this Provider, Rhode Island Hospital, or subsequent to the audit, identify any PA of this Provider who has a billing number assigned to him or her. Moreover, the Provider's representatives are unaware of any such PA employed by the Provider during FYE 9/30/99. Even if the Provider was aware of such a PA, the Provider would take the position that the mere fact that any particular PA might have a billing number assigned to him or her would not (1) prevent the Provider from seeking reimbursement for the costs of all other PAs without billing numbers nor (2) prevent the Provider from seeking reimbursement for the costs of

the specific PA, so long as the Provider did not also seek Part B reimbursement for the services of the PA. Since the Intermediary has not alleged an argument similar to that raised in the other case, this argument need not be heard by the Board. Nevertheless, the Provider addresses these issues in the event that the Intermediary seeks to introduce evidence similar to that introduced in the case relating to the other provider.

Moreover, the Provider argues that the Kay Letters, in making determinative whether a PA had a number issued to him or her, set up a system that would penalize a provider even though the provider had no knowledge that some other person applied for a PA billing number with respect to services entirely unconnected with the PA's services to the provider's patients. This subjects the provider to a retrospective disallowance based on circumstances entirely beyond the provider's control, and outside the provider's knowledge. The analysis in the Kay Letters is not required by any law, regulation, or prior statement of CMS policy, and it is illogical. Indeed, to subject the provider to such a disallowance runs completely contrary to the principle of "without fault" embodied in 42 U.S.C. § 1395pp.

Second, the Fiscal Intermediary has implied that the Provider must collect "charge" data on its PAs, even though the Provider does not bill such charges to Part B. The Fiscal Intermediary has provided no statement of law requiring such reporting. The Fiscal Intermediary has quoted Sections 2203 and 2204 of the Provider Reimbursement Manual as supportive of its position. The Provider argues that these manual provisions do not speak to the costs of PAs. Indeed, § 2203 clearly states that not all costs need be

associated with a specific charge in order for the costs to be reimbursable or properly apportioned in a facility. For example, § 2203 states:

> In determining reimbursement for the costs of routine services, providers do not use charges but use patient days for apportionment purposes in a skilled nursing facility (to the extent certified) or in a hospital (with separate computations for each separate care unit). Costs of routine services are determined based on the consideration that all patients in each separate area are receiving similar services.

Routine services include a variety of personal and professional services provided in a hospital, including "nursing services." PRM-I, § 2202.6, Medicare & Medicaid Guide (CCH) ¶6095 (P-6). The Provider utilizes PAs in much the same manner that it utilizes nurses, including, *inter alia*, blood draws, administration of fluids, participating in "code blues," assessing patient status, providing wound care, transporting patients within the facility, educating patients, maintaining QA, safety, environmental and infection control in accordance with Provider procedures, following physician orders, and preparing patients for surgery.

Third, the Fiscal Intermediary has previously relied on instructions to completing line 34 of Worksheet A-8 of the cost report as alleged evidence that the costs of PAs must be billed to Part B. The Provider argues that line 34 is plainly designed to pick up "*any*" payments that may have been made directly to the PA from Part B. The purpose of this is to "avoid duplication of payments." This is relevant only if the PA is billing separately. Again, the Provider does not dispute that the PA *may* bill under Part B. The instructions merely provide for the mechanism to account for such receipts if the PA does, in fact, bill.

Fourth, the Intermediary has referred to HCFA Ruling No. 98-1 arguing that it somehow reinforces the Intermediary's position. However, on review of the ruling, it is clear that the ruling speaks to the process by which a Medicare supplier may appeal the denial of a billing number. The kinds of suppliers that are discussed in the ruling include physicians, PAs, nurse practitioners, clinical social workers, clinical nurse specialists, certified nurse-midwifes, and clinical psychologists. Again, the Provider does not dispute that this ruling, and many other documents, support the proposition that a PA *may* bill under Part B. However, this document simply does not address the central question in dispute – whether some provision of Medicare law *prohibits* the reimbursement for the costs of the PA that does not bill Part B.

:

The Provider alleges that nothing on which the Intermediary has relied squarely disputes the Provider's analysis, which analysis is supported by CMS's clear instructions, and, therefore, the Intermediary has not refuted the Provider's evidence.

**E. Section 4512 of the Balanced Budged Act supports the Provider's argument that Congress assumed Part A cost reimbursement was available for PA costs.**

Section 4512 of the BBA amended Section 1861s(2)(K)(i) and removed the restriction on the setting in which a PA could practice. Prior to the BBA, PA services were restricted to hospitals and other institutional providers. In addition, the section clarified that the PA service would be a separate "medical and other health service" "only if no facility or other provider charges *or is paid any amounts with respect to the furnishing of such services.*" P-7. This addition should be interpreted as the

acknowledgement that Congress wanted to prevent PAs' services from being both separately reimbursed under Part B, and also cost reimbursed under Part A. The language "is paid any amounts" reflects reimbursement under a system other than a charge-based system. The fact that Congress chose to separate "charges" from "is paid any amounts with respect to the furnishing of such services" with an "*or*," indicates that Congress knew that reimbursement under *both* the "charge" based Part B system, and the cost based Part A system could be accessed by a provider that utilizes a PA. Therefore, the BBA revision reinforces the Provider's interpretation that the costs of PAs may be paid to the Provider, so long as neither the Provider nor anyone else charges the Program for the PA services under Part B.

**F. The Intermediary's disallowance of PA costs should be reversed.**

It is uncontroverted, and admitted on the Intermediary's adjustment report, that the Provider did not bill the Part B carrier for its PAs' services. The Intermediary has not alleged that a single one of the Provider's PAs had a billing number during the period in question. Under CMS's own analysis, then, these costs should be reimbursed. The Intermediary must be estopped from taking a position contrary to that of CMS. Consequently, the Board should reverse the Intermediary's disallowances of the costs of PAs.

The Provider calculates the reimbursement impact of this adjustment at P-8 as being $32,123. The Provider notes that this reimbursement impact calculation also

includes the costs of nurse practitioners, which the Provider asserts should have been reimbursed for the exact same reasons as with PAs.[5]

**4. Issues Numbered 4 & 5 - IME and GME Count.**

The Provider challenges the Intermediary's GME and IME count for fiscal year ending ("FYE") 9/30/99. This challenge applies both to the impact of the base year count as it sets the cap for residents in FYE 9/30/99 as well as the actual count allowed by the Fiscal Intermediary for 9/30/99. FYE September 30, 1996 was the Provider's base year for IME and GME. The Provider is dissatisfied with the base year count and has challenged that count in the context of its appeal to the Board for FYE 9/30/96, PRRB Case No.: 98-2026. The Provider has also appealed the count for FYE 9/30/98, PRRB Case No. 01-1008. Consequently, the Provider has appealed the impact of the count on the count for FYE 9/30/96, 9/30/98 and FYE 9/30/99. Depending on how FYE 9/30/96 and 9/30/98 are resolved, there may be a direct reimbursement impact on FYE 9/30/99 because of the rolling average methodologies for IME and DME, the cap on the ratios of interns and residents to beds, and the total number of FTEs that may be allowed in FYE 9/30/99 based on the Provider's current full time equivalent ("FTE") cap.

For the reasons described above, the precise reimbursement impact is uncertain at this time in light of the lack of resolution of the base year count. However, the Provider estimates that the reimbursement impact, should the base year count be revised, will be

[5] To the extent that the Board construes the disallowance of PA costs and NP costs as separate issues, the Provider requests that the issue of NP costs be added to this appeal. The Provider intends this issue to protest the disallowances of the costs of all non-physician providers that fall within the PA analysis set forth above.

approximately $400,000. The Provider incorporates by reference the arguments made in the FYEs 9/30/96 and 9/30/98 to support this calculation (i.e., if the Board approves the Provider's requests made in connection with these other appeals, then the calculation of $400,000 appears for FYE 9/30/99). The Provider calculates the $400,000 as follows: Assuming that the base year cap is lifted as protested in the base year appeal, the Provider expects that these issues will add 5.22 IME FTE interns and residents for FYE 9/30/96. The Provider estimates the IME reimbursement impact to be approximately $80,000 per FTE, resulting in over $400,000 in IME reimbursement impact for 9/30/99.

The Provider and the Fiscal Intermediary have engaged in good faith negotiations to reach an administrative resolution of these issues. These negotiations have been undertaken with respect to the count for the base year. However, the Provider and the Fiscal Intermediary intend to continue these negotiations with respect to the costs in FYE 9/30/99 as well. To the extent that the resolution of PRRB Case Nos.: 98-2026 or 01-1008 impacts the issues in this appeal, the Provider will modify the issues it presents at hearing, accordingly. The Provider believes that it will be able to reach an administrative resolution with the Fiscal Intermediary without resort to a hearing on its FYE 9/30/96 appeal, and prior to the hearing in the instant case. If the Provider must present its arguments at the hearing, the Provider would do so by the production of extensive oral testimony to support these issues. However, the Provider submits this Final Position Paper with respect to all the issues in order to comply with customary Board practice.

To support the Provider's position pertaining to the GME and IME resident counts, the Provider undertook a review of the Fiscal Intermediary's audit practices with respect to the Provider's IME and DME calculations. In addition, since the hearing on the 9/30/96 appeal should be concluded, if at all, prior to the hearing in this matter, the Provider will work to use the same hearing exhibits in both matters to the extent practicable.

The Provider asserts that the similar pervasive audit errors identified in the FYE 9/30/96 cost reporting period occurred in the FYE 9/30/99 cost reporting period. In addition, the Provider asserts that the Fiscal Intermediary's practices in FYE 9/30/99 were influenced by the same false assumptions as in the FYE 9/30/96 audit. Specifically, the vast majority of audit adjustments were based on statistical sampling, rather than a line-by-line review of all activities performed by all interns, residents and fellows in the Provider's approved GME programs. For IME, a total of 23.18 FTEs were adjusted by the Fiscal Intermediary, and for DME a total of 20.96 FTEs were adjusted by the Fiscal Intermediary, solely based on statistical sampling and extrapolation of those results.

The Provider shall cross-examine the Intermediary on its statistical sampling methodology (which methodology is not disclosed in its workpapers) at the Hearing. The Provider believes that the same audit errors pervasive in the FYE 9/30/96 through 9/30/98 audits influenced the sampling in 9/30/99. Thus, the resolution of the earlier cases, should, at least, cause the Intermediary to agree to change its sampling methodology.

In addition to statistical sampling, the Provider also asserts additional FTEs should be added back to resident counts in the following areas:

- Approximately 3.25 IME FTEs, of a total 4.07 IME FTEs adjusted upon audit, should be added back to the counts for clinical research performed as part of approved program training.

- For psychiatry programs, approximately 8.75 IME FTEs, of a total of 10.39 FTEs adjusted upon audit, should be added back to the counts for time spent in the PPS units. It was assumed upon audit that all psychiatry time was spent in distinct part, TEFRA units, which was not the case during this fiscal year. The Provider submits P-17, which outlines the specific residents in question, and the PPS locations of their activities. P-17 is a summary of all residents in the core psychiatry program, and highlighting those few months that may be excluded for IME purposes. The Provider notes that of the 123 months of approved program activity at the Provider, only 18 months we performed in the Provider's inpatient distinct-part units. The remaining 105 months were in the Provider's PPS units, and should be included for IME. All 123 months were excluded, which is clearly an incorrect method of counting the residents in the approved, accredited psychiatry program. The Provider submits P-18, presenting the rotation schedules supporting the summary at P-17. P-18 is the contemporaneous rotation schedule documentation of the residents in the core psychiatry program. The Provider also submits similar documentation regarding the

residents in the Provider's child psychiatry program, including a summary at P-19, and the rotation schedules at P-20.

(The Provider has redacted exhibits P-17 through P-20 in accordance with an understanding with the Fiscal Intermediary that information identifying the physicians in question is private. Consequently, only the first two letters of the residents' last names are included on P-17 through P-20 has been blacked-out. An envelope containing the unredacted documentation is included with this submission, and the Provider respectfully requests the Board grant this information confidential status to the fullest extent permitted by law. The Fiscal Intermediary has been given the unredacted documentation.)

- For IME, there is an additional variance of 2.77 FTEs, that was unexplained in the Fiscal Intermediary work papers, which the Provider requests clarification.

- In medicine/pediatrics, the Fiscal Intermediary excluded 0.83 weighted DME FTEs from the counts, as well as a total of 20.96 months for IME and DME. From the Fiscal Intermediary's work papers it is unclear why these adjustments were made, which the Provider requests clarification.

- The Provider shall present oral testimony regarding several additional FTE residents whose underlying documentation has been presented to the Fiscal Intermediary during audit, but who the Fiscal Intermediary excluded based on its

statistical sampling or other disallowances.

The Provider shall produce fact witnesses at the Hearing to support these arguments. The Provider respectfully requests the Board order adjustment to the Provider's resident counts accordingly.

Pursuant to 42 C.F.R. 405.1841(a)(1), the Provider reserves the right to amend or supplement the arguments made in this Final Position Paper with written evidence and oral testimony, as well as to present additional claims, arguments, and evidence in its Hearing before the Board.

**5. Issue No. 6 - Reimbursed Salaries.**

The Provider has protested the Intermediary's actions in transferring the costs of Provider employees who were leased from time-to-time to other providers. The Provider received payment for the services of the leased employees from such other providers, and the Provider offset these payments accordingly on worksheet ("W/S") A-8. The Intermediary takes the position that the entire cost of the employee should be transferred to a nonreimbursable cost center per W/S A-6. The Provider protests this treatment, and prays the Board order the Intermediary to accept the offset of revenue, rather than reclassify, as the former is the more accurate method of cost finding, and more in accordance with Medicare law.

The Provider asserts, and the Intermediary would likely concur, that the employees in question both worked for the Provider and also were leased to other providers during FYE 9/30/99. Thus, the entire reclassification of the employee's salaries unreasonably removes at least those costs associated with services to the Provider's patients. If these employees never worked for the Provider, the justification for reclassifying the entire cost of each employee might be stronger. However, the costs of these employees servicing the Provider and other providers are too intertwined to realistically reallocate the costs. In such a case, the offset of revenue received from the outside provider is the correct way to adjust for the non-Provider service.

At least three Board decisions support the Provider's contention. In Highland Farms Health Care Center, PRRB Dec. No. 79-D14, (March 15, 1999) (P-9); HCFA Administrator Decision, May 12, 1999 (P-10), the Board held that revenue generated by skilled nursing facility nurses working at other health care entities, in this case, other residential facilities, should be offset against their costs. In so holding, the Board wrote:

> The Board finds that nursing service revenue must be used to reduce the provider's nursing cost. Evidence presented clearly demonstrates that the provider was unable to determine the actual cost of providing the nursing service to the apartment residence which is unrelated to patient care. Section 2328 [CCH ¶6670] (HIM-15) requires that, where cost centers are not maintained for unrelated patient care functions, the income derived must be used to reduce provider costs.

Similarly, in Mecklenberg Home Health, Inc. PRRB Dec. No. 87-D99, Dept. 3, 1987 (P-11), the Board held that revenues from the Provider's data processing services sold to other home health agencies should be offset against cost, rather than estimating the cost of the services sold, and moving those costs to a nonreimbursable cost center.

Finally, in South Shore Hospital, PRRB Dec. No. 87-D22, Nov. 24, 1986 (P-12); HCFA Administrator Decision, Jan. 23, 1987 (P-13), the Board held that revenue derived from billing service functions, in this case payments from a health plan to track primary and secondary payors, should be offset against "total hospital costs" because the costs were so "intertwined" with the normal billing and accounting function's costs that the establishment of a separate cost center would not be appropriate for the nonallowable activity.

The Provider acknowledges that one case could be read as supporting the creation of a separate cost center for services sold to outside entities, however, that case is distinguishable, because the costs in question were fungible, and easily separated (i.e., they were not "intertwined."). In South County Hospital v. BCBSRI, PRRB Dec. No. 84-D108, April 12, 1984 (P-14), the Board held that the Hospital should not offset revenue of telephone extensions for physicians, instead, the Provider should set up a separate cost center. The reasoning behind this decision is not thoroughly explained in the decision, but it is likely that the fact that the costs of these phone services are easily, and automatically tracked weighed heavily in the decision. Moreover, South County is the oldest of the PRRB decisions the Provider located on point and is, therefore, entitled to far less weight than the more current opinions, all of which favor the Provider's interpretation.

A related, and subsidiary, issue arising from Issue No. 6 is that another effect of the Intermediary's reclassification of the leased employee costs was that the fringe benefits of these individuals have been adjusted out *twice*. The Provider argues that even if the Board agrees with the Intermediary that a separate cost center should be maintained, that the Board should require the fringe benefits to be removed only once.

The Provider attaches hereto as Exhibit P-15 a Settlement Summary with two related schedules (marked Schedule A and Schedule B) demonstrating the calculation of the reimbursement impact, with supporting back-up. The Provider calculates that the reimbursement impact of this adjustment to be $42,025.

The Provider, therefore, prays the Board reverse the Intermediary's adjustment, and restore the Provider's offset of revenue for leased employees.

**6. Issue No. 7 – Managed Care Billing.**

The Intermediary made a significant adjustment to the Provider's total Medicare days at through Adjustment P062. This adjustment accounted for Medicare patients that also had coverage under a Medicare risk/M+C third party payor (e.g., BlueCHiP for Medicare, BlueCHiP Medicare Risk, First Seniority, and UHP Senior Care). A Medicare risk/M+C paid the Provider for hospitalizations. In such cases, the days must be counted for, *inter alia*, IME payments. The Provider reported the patients' stays to the Intermediary through a "shadow bill" that does not demand payment, but notifies the

Intermediary that payment had been made for these beneficiaries. Thus the Provider reports these patients to the Intermediary so that the total Medicare days may be taken into account.

The Intermediary and the Provider recognize that there is often a lag in the processing of shadow bills, and that, consequently, these adjustments follow the end of the fiscal year or NPR. The Provider anticipates the Intermediary will be preparing a revised NPR ("RNPR") to cover these adjustments and the Provider and the Intermediary have been working collaboratively to resolve these accounting issues. The Provider will withdraw this issue once an acceptable RNPR is received.

The decrease in total Medicare days has a variety of impacts on the Provider's NPR, not the least of which is with regard to IME, protested on other bases at Issue No. 5 herein.

The Provider attached as P-16 hereto, the backup for these patients, broken down by payor as well as the calculation of reimbursement impact. [Note: the Provider has included this exhibit in a redacted form because it contains confidential business information. The complete exhibit is included in a sealed envelope included herewith. The Provider requests the Board maintain the confidentiality of this document to the fullest extent possible.] The calculation of the reimbursement impact is extremely complicated, and relates to other issues appealed herein, and subject to RNPR. However, based on the attachment referenced herein, the Provider calculates that the reimbursement

impact of this adjustment to be approximately $1,297,000. The first page of P-16 includes the calculation and the following pages of P-16 demonstrate how the calculation produces the reimbursement impact of $1,297,000.

The Provider prays the Board reverse the Intermediary's adjustment, if the RNPR is not received prior to the Hearing.

**7. Issue No. 8 – Psychology Interns.**

Based on further consideration of the arguments articulated by the Fiscal Intermediary, the Provider hereby withdraws Issue No. 8 – Psychology Interns. The Provider shall seek any further redress of this issue for FYE 9/30/99 through the reopening process.

## III. CONCLUSION.

For the reasons set forth above, the Board should reverse the Intermediary's adjustments in question and order the Intermediary to reimburse the Provider for the costs claimed and due to the Provider.

The Provider reserves the right to supplement this Final Position Paper as permitted by law, including the right to make other and further arguments or add additional issues prior to the Hearing.

Respectfully submitted,

Rhode Island Hospital
By its Designated Representatives,

Lawrence W. Vernaglia, Esq.
HINCKLEY, ALLEN & SNYDER LLP
28 State Street
Boston, Mass. 02109
Tel: (617) 345-9000
Fax: (617) 345-9020

Date: September 30, 2002

# TABLE OF AUTHORITIES

STATUTES

| | |
|---|---|
| 42 U.S.C. § 1395pp | Without fault |
| Section 4512, Pub. L. No. 105-33 (Aug. 5, 1997) | Increased Medicare Reimbursement for Physician Assistants, The Balanced Budget Act of 1997 |
| SSA § 1861s(2)(K)(i) | Definition of physician assistant services |

REGULATIONS

| | |
|---|---|
| 42 C.F.R. 405.1841(a)(1) | Provider's right to add issues prior to Hearing |
| 42 C.F.R. 413.9(c)(3) | Reimbursable Costs |
| 66 Fed. Reg. 3377, (January 12, 2001) | Psychology training proposed rule |

MANUAL PROVISIONS

| | |
|---|---|
| HCFA Pub. 15-I, Section 2203 | Provider charge structure |
| HCFA Pub. 15-I, Section 2204 | Medicare charges |
| HCFA Pub. 15-I, Section 2202.6 | Routine services |

HCFA RULINGS

| | |
|---|---|
| HCFA Ruling No. 98-1 | Medicare carrier appeal process |

HEARING DECISIONS

Highland Farms Health Care Center, PRRB Dec. No. 79-D14, (March 15, 1999) (P-9)

Highland Farms Health Care Center, HCFA Administrator Decision, May 12, 1999 (P-10)

Mecklenberg Home Health, Inc., PRRB Dec. No. 87-D99, Dept. 3, 1987 (P-11)

South Shore Hospital, PRRB Dec. No. 87-D22, Nov. 24, 1986 (P-12)

Mecklenberg Home Health, Inc., HCFA Administrator Decision, Jan. 23, 1987 (P-13)

South County Hospital v. BCBSRI, PRRB Dec. No. 84-D108, April 12, 1984 (P-14)

## TABLE OF EXHIBITS


Table of Patient Days for DSH analysis ................................................................P-1

Confirmatory Letter of Lawrence W. Vernaglia dated March 28, 2000 ...................P-2

Response of Terrence L. Kay dated April 7, 2000 ...................................................P-3

Further Response of Terrence L. Kay dated November 6, 2000 ..............................P-4

FOIA Request of Lawrence W. Vernaglia dated June 21, 2000...............................P-5

HCFA Pub. 15-I, § 2202.6 – Routine Services........................................................P-6

Section 4512 of the BBA and SSA § 1861s(2)(K)(i) ...............................................P-7

Calculation of Reimbursement Impact of non-physician providers .........................P-8

Highland Farms Health Care Center, PRRB Dec. No. 79-D14,

(March 15, 1999) .......................................................................................................P-9

Highland Farms Health Care Center, HCFA Administrator Decision,

(May 12, 1999)..........................................................................................................P-10

Mecklenberg Home Health, Inc., PRRB Dec. No. 87-D99, Dept. 3, 1987 ..............P-11

South Shore Hospital, PRRB Dec. No. 87-D22, Nov. 24, 1986..............................P-12

Mecklenberg Home Health, Inc., HCFA Administrator Decision, Jan. 23, 1987.....P-13

South County Hospital v. BCBSRI, PRRB Dec. No. 84-D108, April 12, 1984 .......P-14

Reimbursed Salaries Issue Reimbursement Impact Calculation Worksheets...........P-15

Managed Care Days Reimbursement Impact Calculation Worksheets .....................P-16

Psychiatry Residents and Service Location ..............................................................P-17

Rotation Schedule for Core Psychiatry Program ......................................................P-18

Child Psychiatry Residents and Service Location ....................................................P-19

Rotation Schedule for Child Psychiatry Program ......................................................P-20

CERTIFICATE OF SERVICE

I, Lawrence W. Vernaglia, Esq., hereby certify that I have this date forwarded a copy of the foregoing Final Position Paper of the Provider, Rhode Island Hospital: to the Fiscal Intermediary c/o Ms. Ann Waszeciak, Appeals Coordinator, Medicare, Blue Cross and Blue Shield of Rhode Island, Provider Audit Reimbursement Department, 444 Westminster Street, Providence, RI 02903-3279; and Eileen Bradley, Esq., Associate Counsel, Blue Cross Blue Shield Association, 1310 G. Street N.W., Washington, D.C. 20005 by Federal Express.

Lawrence W. Vernaglia, Esq.

Dated: September 30, 2002



#399817.1