# P-7

would otherwise be recognized if performed by a physician who is serving as an assistant at surgery; and".

(2) CONFORMING AMENDMENTS.—Section 1833(r) (42 U.S.C. 1395l(r)) is amended—

(A) in paragraph (1), by striking "section 1861(s)(2)(K)(iii) (relating to nurse practitioner or clinical nurse specialist services provided in a rural area)" and inserting "section 1861(s)(2)(K)(ii) (relating to nurse practitioner or clinical nurse specialist services)";

(B) by striking paragraph (2);

(C) in paragraph (3), by striking "section 1861(s)(2)(K)(iii)" and inserting "section 1861(s)(2)(K)(ii)"; and

(D) by redesignating paragraph (3) as paragraph (2).

(c) DIRECT PAYMENT FOR NURSE PRACTITIONERS AND CLINICAL NURSE SPECIALISTS.—Section 1832(a)(2)(B)(iv) (42 U.S.C. 1395k(a)(2)(B)(iv)) is amended by striking "provided in a rural area (as defined in section 1886(d)(2)(D))" and inserting "but only if no facility or other provider charges or is paid any amounts with respect to the furnishing of such services".

(d) DEFINITION OF CLINICAL NURSE SPECIALIST CLARIFIED.—Section 1861(aa)(5) (42 U.S.C. 1395x(aa)(5)) is amended—

(1) by inserting "(A)" after "(5)";

(2) by striking "The term 'physician assistant'" and all that follows through "who performs" and inserting "The term 'physician assistant' and the term 'nurse practitioner' mean, for purposes of this title, a physician assistant or nurse practitioner who performs"; and

(3) by adding at the end the following new subparagraph:

"(B) The term 'clinical nurse specialist' means, for purposes of this title, an individual who—

"(i) is a registered nurse and is licensed to practice nursing in the State in which the clinical nurse specialist services are performed; and

"(ii) holds a master's degree in a defined clinical area of nursing from an accredited educational institution.".

(e) EFFECTIVE DATE.—The amendments made by this section shall apply with respect to services furnished and supplies provided on and after January 1, 1998.

**SEC. 4512. INCREASED MEDICARE REIMBURSEMENT FOR PHYSICIAN ASSISTANTS.**

(a) REMOVAL OF RESTRICTION ON SETTINGS.—Section 1861(s)(2)(K)(i) (42 U.S.C. 1395x(s)(2)(K)(i)), as amended by section 4511, is amended—

(1) by striking "(I) in a hospital" and all that follows through "shortage area,", and

(2) by adding at the end the following: "but only if no facility or other provider charges or is paid any amounts with respect to the furnishing of such services,".

(b) INCREASED PAYMENT.—

(1) FEE SCHEDULE AMOUNT.—Section 1833(a)(1)(O) (42 U.S.C. 1395l(a)(1)(O)), as amended by section 4511, is further amended—

(A) by striking "section 1861(s)(2)(K)(ii)" and inserting "1861(s)(2)(K)", and

(B) by striking "nurse practitioner or clinical nurse specialist services" and inserting "services furnished by physician assistants, nurse practitioners, or clinic nurse specialists".

(2) CONFORMING AMENDMENT.—Paragraph (12) of section 1842(b) (42 U.S.C. 1395u(b)) is repealed.

(c) REMOVAL OF RESTRICTION ON EMPLOYMENT RELATIONSHIP.—Section 1842(b)(6) (42 U.S.C. 1395u(b)(6)), as amended by section 4205, is amended by adding at the end the following new sentence: "For purposes of subparagraph (C) of the first sentence of this paragraph, an employment relationship may include any independent contractor arrangement, and employer status shall be determined in accordance with the law of the State in which the services described in such clause are performed.".

(d) EFFECTIVE DATE.—The amendments made by this section shall apply with respect to services furnished and supplies provided on and after January 1, 1998.

**SEC. 4513. NO X-RAY REQUIRED FOR CHIROPRACTIC SERVICES.**

(a) IN GENERAL.—Section 1861(r)(5) (42 U.S.C. 1395x(r)(5)) is amended by striking "demonstrated by X-ray to exist".

(b) EFFECTIVE DATE.—The amendment made by subsection (a) applies to services furnished on or after January 1, 2000.

(c) UTILIZATION GUIDELINES.—The Secretary of Health and Human Services shall develop and implement utilization guidelines relating to the coverage of chiropractic services under part B of title XVIII of the Social Security Act in cases in which a subluxation has not been demonstrated by X-ray to exist.

## CHAPTER 2—PAYMENT FOR HOSPITAL OUTPATIENT DEPARTMENT SERVICES

**SEC. 4521. ELIMINATION OF FORMULA-DRIVEN OVERPAYMENTS (FDO) FOR CERTAIN OUTPATIENT HOSPITAL SERVICES.**

(a) ELIMINATION OF FDO FOR AMBULATORY SURGICAL CENTER PROCEDURES.—Section 1833(i)(3)(B)(i)(II) (42 U.S.C. 1395l(i)(3)(B)(i)(II)) is amended—

(1) by striking "of 80 percent"; and

(2) by striking the period at the end and inserting the following: ", less the amount a provider may charge as described in clause (ii) of section 1866(a)(2)(A).".

(b) ELIMINATION OF FDO FOR RADIOLOGY SERVICES AND DIAGNOSTIC PROCEDURES.—Section 1833(n)(1)(B)(i) (42 U.S.C. 1395l(n)(1)(B)(i)) is amended—

(1) by striking "of 80 percent", and

(2) by inserting before the period at the end the following: ", less the amount a provider may charge as described in clause (ii) of section 1866(a)(2)(A)".

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to services furnished during portions of cost reporting periods occurring on or after October 1, 1997.

**SEC. 4522. EXTENSION OF REDUCTIONS IN PAYMENTS FOR COSTS OF HOSPITAL OUTPATIENT SERVICES.**

(a) REDUCTION IN PAYMENTS FOR CAPITAL-RELATED COSTS.—Section 1861(v)(1)(S)(ii)(I) (42 U.S.C. 1395x(v)(1)(S)(ii)(I)) is amended by striking "through 1998" and inserting "through 1999 and during fiscal year 2000 before January 1, 2000".

**Soc. Sec. Act §1861 DEFINITIONS OF SERVICES, INSTITUTIONS, ETC., Subsection (s) Medical and Other Health Services**

**42 U.S.C. §1395x(s)**

**Sec. 1861**(s) The term "medical and other health services" means any of the following items or services:

(1) physicians' services;

(2)(A) services and supplies (including drugs and biologicals which are not usually self-administered by the patient) furnished as an incident to a physician's professional service, of kinds which are commonly furnished in physicians' offices and are commonly either rendered without charge or included in the physicians' bills;

(B) hospital services (including drugs and biologicals which are not usually self-administered by the patient) incident to physicians' services rendered to outpatients and partial hospitalization services incident to such services; and

(C) diagnostic services which are--

(i) furnished to an individual as an outpatient by a hospital or by others under arrangements with them made by a hospital, and

(ii) ordinarily furnished by such hospital (or by others under such arrangements) to its outpatients for the purpose of diagnostic study;

(D) outpatient physical therapy services and outpatient occupational therapy services;

(E) rural health clinic services and federally qualified health clinic services;

(F) home dialysis supplies and equipment, self-care home dialysis support services, and institutional dialysis services and supplies;

(G) antigens (subject to quantity limitations prescribed in regulations by the Secretary) prepared by a physician, as defined in section 1861(r)(1), for a particular patient, including antigens so prepared which are forwarded to another qualified person (including a rural health clinic) for administration to such patient, from time to time, by or under the supervision of another such physician;

(H)(i) services furnished pursuant to a contract under section 1876 to a member of an eligible organization by a physician assistant or by a nurse practitioner (as defined in subsection (aa)(5)) and such services and supplies furnished as an incident to his service to such a member as would otherwise be covered under this part if furnished by a physician or as an incident to a physician's service; and

(ii) services furnished pursuant to a risk-sharing contract under section 1876(g) to a member of an eligible organization by a clinical psychologist (as defined by the Secretary) or by a clinical social worker (as defined in subsection (hh)(2)), and such services and supplies furnished as an incident to such clinical psychologist's services or clinical social worker's services to such a member as would otherwise be covered under this part if furnished by a physician or as an incident to a physician's service;

(I) blood clotting factors, for hemophilia patients competent to use such factors to control bleeding without medical or other supervision, and items related to the administration of such factors, subject to utilization controls deemed necessary by the Secretary for the efficient use of such factors;

(J) prescription drugs used in immunosuppressive therapy furnished to an individual who receives an organ transplant, for which payment is made under this title;

(K)(i) services which would be physicians' services if furnished by a physician (as defined in subsection (r)(1)) and which are performed by a physician assistant (as defined in subsection (aa)(5)) under the supervision of a physician (as so defined) but only if no facility or other provider charges or is paid any amounts with respect to the furnishing of such services, and which the physician assistant is legally authorized to perform by the State in which the services are

performed and such services and supplies furnished as incident to such services as would be covered under subparagraph (A) if furnished incident to a physician's professional service; and

(ii) services which would be physicians' services if furnished by a physician (as defined in subsection (r)(1)) and which are performed by a nurse practitioner or clinical nurse specialist (as defined in subsection (aa)(5)) working in collaboration (as defined in subsection (aa)(6)) with a physician (as defined in subsection (r)(1)) which the nurse practitioner or clinical nurse specialist is legally authorized to perform by the State in which the services are performed, and such services and supplies furnished as an incident to such services as would be covered under subparagraph (A) if furnished incident to a physician's professional service, but only if no facility or other provider charges or is paid any amounts with respect to the furnishing of such services;

(L) certified nurse-midwife services;

(M) qualified psychologist services;

(N) clinical social worker services (as defined in subsection (hh)(2));

(O) erythropoietin for dialysis patients competent to use such drug without medical or other supervision with respect to the administration of such drug, subject to methods and standards established by the Secretary by regulation for the safe and effective use of such drug, and items related to the administration of such drug;

(P) prostate cancer screening tests (as defined in subsection (oo));

(Q) an oral drug (which is approved by the Federal Food and Drug Administration) prescribed for use as an anticancer chemotherapeutic agent for a given indication, and containing an active ingredient (or ingredients), which is the same indication and active ingredient (or ingredients) as a drug which the carrier determines would be covered pursuant to subparagraph (A) or (B) if the drug could not be self-administered;

(R) colorectal cancer screening tests (as defined in subsection (pp));

(S) diabetes outpatient self-management training services (as defined in subsection (qq));

(T) an oral drug (which is approved by the Federal Food and Drug Administration) prescribed for use as an acute antiemetic used as part of an anticancer chemotherapeutic regimen if the drug is administered by a physician (or as prescribed by a physician)--

(i) for use immediately before, at, or within 48 hours after the time of the administration of the anticancer chemotherapeutic agent; and

(ii) as a full replacement for the anti-emetic therapy which would otherwise be administered intravenously;

(U) screening for glaucoma (as defined in subsection (uu)) for individuals with a family history of glaucoma and individuals with diabetes; and

(V) medical nutrition therapy services (as defined in subsection (vv)(1)) in the case of a beneficiary with diabetes or a renal disease who--

(i) has not received diabetes outpatient self-management training services within a time period determined by the Secretary;

(ii) is not receiving maintenance dialysis for which payment is made under section 1881; and

(iii) meets such other criteria determined by the Secretary after consideration of protocols established by ietitian or nutrition professional organizations;

(3) diagnostic X-ray tests (including tests under the supervision of a physician, furnished in a place of residence used as the patient's home, if the performance of such tests meets such conditions relating to health and safety as the Secretary may find necessary and including diagnostic mammography if conducted by a facility that has a certificate (or provisional

certificate) issued under section 354 of the Public Health Service Act), diagnostic laboratory tests, and other diagnostic tests;

(4) X-ray, radium, and radioactive isotope therapy, including materials and services of technicians;

(5) surgical dressings, and splints, casts, and other devices used for reduction of fractures and dislocations;

(6) durable medical equipment;

(7) ambulance service where the use of other methods of transportation is contraindicated by the individual's condition, but only to the extent provided in regulations;

(8) prosthetic devices (other than dental) which replace all or part of an internal body organ (including colostomy bags and supplies directly related to colostomy care), including replacement of such devices, and including one pair of conventional eyeglasses or contact lenses furnished subsequent to each cataract surgery with insertion of an intraocular lens;

(9) leg, arm, back, and neck braces, and artificial legs, arms, and eyes, including replacements if required because of a change in the patient's physical condition;

(10)(A) pneumococcal vaccine and its administration and, subject to section 4071(b) of the Omnibus Budget Reconciliation Act of 1987, influenza vaccine and its administration; and

(B) hepatitis B vaccine and its administration, furnished to an individual who is at high or intermediate risk of contracting hepatitis B (as determined by the Secretary under regulations);

(11) services of a certified registered nurse anesthetist (as defined in subsection (bb));

(12) subject to section 4072(e) of the Omnibus Budget Reconciliation Act of 1987, extra-depth shoes with inserts or custom molded shoes with inserts for an individual with diabetes, if--

(A) the physician who is managing the individual's diabetic condition (i) documents that the individual has peripheral neuropathy with evidence of callus formation, a history of pre-ulcerative calluses, a history of previous ulceration, foot deformity, or previous amputation, or poor circulation, and (ii) certifies that the individual needs such shoes under a comprehensive plan of care related to the individual's diabetic condition;

(B) the particular type of shoes are prescribed by a podiatrist or other qualified physician (as established by the Secretary); and

(C) the shoes are fitted and furnished by a podiatrist or other qualified individual (such as a pedorthist or orthotist, as established by the Secretary) who is not the physician described in subparagraph (A) (unless the Secretary finds that the physician is the only such qualified individual in the area);

(13) screening mammography (as defined in subsection (jj)); and

(14) screening pap smear and screening pelvic exam; and

(15) bone mass measurement (as defined in subsection (rr)).

No diagnostic tests performed in any laboratory, including a laboratory that is part of a rural health clinic, or a hospital (which, for purposes of this sentence, means an institution considered a hospital for purposes of section 1814(d)) shall be included within paragraph (3) unless such laboratory--

(16) if situated in any State in which State or applicable local law provides for licensing of establishments of this nature, (A) is licensed pursuant to such law, or (B) is approved, by the agency of such State or locality responsible for licensing establishments of this nature, as meeting the standards established for such licensing; and

(17)(A) meets the certification requirements under section 353 of the Public Health Service Act; and

(B) meets such other conditions relating to the health and safety of individuals with respect to whom such tests are performed as the Secretary may find necessary.

There shall be excluded from the diagnostic services specified in paragraph (2)(C) any item or service (except services referred to in paragraph (1)) which would not be included under subsection (b) if it were furnished to an inpatient of a hospital. None of the items and services referred to in the preceding paragraphs (other than paragraphs (1) and (2)(A)) of this subsection which are furnished to a patient of an institution which meets the definition of a hospital for purposes of section 1814(d) shall be included unless such other conditions are met as the Secretary may find necessary relating to health and safety of individuals with respect to whom such items and services are furnished.

**2000 Amendments:**

Sec. 102(a) of the "Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000," applicable to services furnished on or after January 1, 2002, amended paragraph (s)(2) by striking "and" at the end of subparagraph (S); adding "and" at the end of subparagraph (T); and adding a new subparagraph (U).

Sec. 105(a) of the "Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000," applicable to services furnished on or after January 1, 2002, amended paragraph (s)(2) by striking "and" at the end of subparagraph (T); adding "and" at the end of subparagraph (U); and adding a new subparagraph (V).

Sec. 112(a) of the "Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000," applicable to drugs and biologicals administered on or after December 21, 2000, amended each of subparagraphs (A) and (B) by striking "(including drugs and biologicals which cannot, as determined in accordance with regulations, be self-administered)" and inserting "(including drugs and biologicals which are not usually self-administered by the patient)".

Prior to amendment by sec. 113(a) of the "Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000," applicable to drugs furnished on or after December 21, 2000, subparagraph (s)(2)(J) read as follows:

"(J) prescription drugs used in immunosuppressive therapy furnished to an individual who receives an organ transplant, for which payment is made under this title, but only in the case of drugs furnished--

"(i) before 1995, within 12 months after the date of the transplant procedure,

"(ii) during 1995, within 18 months after the date of the transplant procedure,

"(iii) during 1996, within 24 months after the date of the transplant procedure,

"(iv) during 1997, within 30 months after the date of the transplant procedure, and

"(v) during any year after 1997, within 36 months after the date of the transplant procedure plus such additional number of months (if any) provided under section 1832(b);"

**1999 Amendments:**

Section 227(a) of the "Medicare, Medicaid, and SCHIP Balanced Budget Refinement Act of 1999" (as incorporated into the "Omnibus Consolidated Appropriations Act, 2000"), effective November 29, 1999, amended clause (2)(J)(v) by adding "plus such additional number of months (if any) provided under section 1832(b)" at the end.

Sec. 321(k)(7) of the "Medicare, Medicaid, and SCHIP Balanced Budget Refinement Act of 1999" (as incorporated into the "Omnibus Consolidated Appropriations Act, 2000"), effective Aug. 5, 1997, amended clause (2)(T)(ii) by striking the period and inserting a semicolon.

**1997 Amendments:**

Prior to amendment by sec. 4511(a)(1) of the "Balanced Budget Act of 1997," applicable to services furnished and supplies provided on or after January 1, 1998, clause (s)(2)(K)(ii) read as follows:

# P-8

Rhode Island Hospital
Protested Amounts
FYE 09/30/99

Provider is protesting the offset of costs that relate to Non Physician Providers. It is our contention that the costs associated with Non Physician Providers are allowable in determining total Medicare reimbursable cost. We have offset the cost on Worksheet A-8, lines 37.63 to 37.72, however, we have also noted the protested amount that should be reimbursable on line 30 of Worksheet E-A and line 36 of Worksheet E-B.

The protested amounts are determined by calculating the cost report with the offfsets included on Worksheet A-8 and again without the offsets on Worksheet A-8.

The result is as follows:

| | With Offset | Without Offset | Inc/ (Dec) |
|---|---|---|---|
| Worksheet E-3, Part IV | | | |
| Line 21, Part A Cost | 0.871965 | 0.871871 | |
| Line 22, Part B Cost | 0.128035 | 0.128129 | |
| Result: | | | |
| Line 24, Part A Payment | 6,369,073 | 6,368,386 | (687) |
| Line 25, Part B Payment | 935,203 | 935,890 | 687 |
| Worksheet E, Part B | | | |
| Line 19 | 2,934,771 | 2,966,188 | 31,417 |
| Worksheet E, Part C | | | |
| Line 21 | 446,507 | 447,170 | 663 |
| Worksheet E, Part D | | | |
| Line 21 | 1,044,020 | 1,044,033 | 13 |
| Worksheet E, Part E | | | |
| Line 21 | 140,196 | 140,226 | 30 |
| Total Reimbursement | | | |
| Part A | | | (687) |
| Part B | | | 32,810 |

# LIST OF ISSUES

| | |
|---|---|
| Provider Name: | Rhode Island Hospital, Providence, Rhode Island |
| Provider No.: | 41-0007 |
| FYE: | 09/30/99 |
| PRRB Case No.: | |
| NPR Date: | 08/22/01 |

The below signed present the following information:

1. We agree that there are no impediments to PRRB jurisdiction over the matters in controversy.

2. The substantive issues are as follows:

| | Issue: | Reimbursement Impact (approx.): |
|---|---|---|
| 1. | Days included in the DSH calculation for Patients who received and/or were eligible For medical assistance under a State plan Approved by Title XIX of the Social Security Act. | $25,000 |
| 2. | Days associated with patients entitle to both Medicare part A and SSI (i.e., the SSI percentage) | $25,000 |
| 3. | Self-disallowance of the costs of physician Assistants | $32,123 |
| 4. | Calculation of the GME Count | More than $10,000 |
| 5. | Calculation of the IME Count | More than $10,000 |
| 6 | Reimbursed Salaries should be offset on W/S A-8 and not W/S A-6 tranferred to non-reimburseable department. | More than $10,000 |
| 7. | Managed Care Billing needs to be updated | More than $10,000 |
| 8. | Psychiatry PHD filed as non-reimburseable Should be included with Allied Health Program Or Non-Approved I & R Program | More than $10,000 |

Ernst & Young - microKOSTPAK SYSTEM VERSION 96
RHODE ISLAND HOSPITAL

PROVIDER NO. : 41-0007

RUN DATE: 06-16-2001
FROM-TO : 10/01/1998 - 09/30/1999
VERSION 96.40a

ADJUSTMENTS TO EXPENSES
SUBMITTED IN LIEU OF HCFA-2552-96
WORKSHEET A-8

| DESCRIPTION (1) | (2) Basis/Code 1 | Amount 2 | Expense Classification on Worksheet A to/from which amount is to be adjusted<br>Cost Center 3 | Line # 4 | Wkst. A-7 Ref. 5 |
|---|---|---|---|---|---|
| 37.36 ADC RENTAL | B | -130786 | Operation Of Plant | 8. | 0 |
| 37.37 AU BON PAIN RENTAL | B | -83333 | Operation Of Plant | 8. | 0 |
| 37.38 N. E. ORGAN BANK RENTAL | B | -5604 | Old Cap Rel Costs-Bldg & Fixt | 1. | 9 |
| 37.39 DAVOL-BAYSIDE RENTAL | B | -119176 | Operation Of Plant | 8. | 0 |
| 37.40 MISC RENTAL INCOME | B | -27789 | Operation Of Plant | 8 | 0 |
| 37.41 MISC RENTAL INCOME | B | -238 | Laundry & Linen Service | 9. | 0 |
| 37.42 NON ALLOWABLE HEARING AIDS | A | -68927 | Speech Pathology | 52. | 0 |
| 37.43 NON ALLOWABLE AMBULANCE SERVIC | A | -2750 | Emergency | 61. | 0 |
| 37 44 PENSION OVERFUNDING | A | -2357710 | Employee Benefits | 5. | 0 |
| 37.45 INVESTMENT INCOME-NEW CAPITAL | A | -819315 | New Cap Rel Costs-Mvble Equip | 4. | 9 |
| 37 46 RECALCULATION OF STARTUP AMORT | A | 124592 | OTHER ADMINISTRATIVE AND GENERAL | 6.06 | 0 |
| 37 47 RECALCULATION OF USEFUL LIFE-1 | A | -115881 | Old Cap Rel Costs-Bldg & Fixt | 1. | 9 |
| 37.48 RECALCULATION OF USEFUL LIFE-1 | A | -733741 | Old Cap Rel Costs-Bldg & Fixt | 1. | 9 |
| 37.49 RECALCULATION OF USEFUL LIFE-1 | A | -2938 | Old Cap Rel Costs-Bldg & Fixt | 1. | 9 |
| 37.50 RECALCULATION OF USEFUL LIFE-1 | A | -199450 | Old Cap Rel Costs-Bldg & Fixt | 1. | 9 |
| 37.51 AMORTIZATION OF REORGANIZATION | A | 248266 | OTHER ADMINISTRATIVE AND GENERAL | 6.06 | 0 |
| 37.52 PHYSCIAN FEE DISALLOWANCE | B | -100000 | OTHER ADMINISTRATIVE AND GENERAL | 6.06 | 0 |
| 37.53 PHYSCIAN FEE DISALLOWANCE | B | -2820 | DEPARTMENT OF MEDICINE | 19.02 | 0 |
| 37.54 PHYSCIAN FEE DISALLOWANCE | B | -205852 | DEPARTMENT OF SURGERY | 19.03 | 0 |
| 37.55 PHYSCIAN FEE DISALLOWANCE | B | -10018 | DEPARTMENT OF PEDIATRICS | 19.04 | 0 |
| 37.56 PHYSCIAN FEE DISALLOWANCE | B | -3825 | I&R Services-Other Prgm Costs Apprvd | 21. | 0 |
| 37.57 PHYSCIAN FEE DISALLOWANCE | B | -85 | Radiology-Therapeutic | 42. | 0 |
| 37.58 PHYSCIAN FEE DISALLOWANCE | B | -774219 | Clinic | 60. | 0 |
| 37.59 PHYSCIAN FEE DISALLOWANCE | B | -12 | Kidney Acquisition | 83. | 0 |
| 37.60 NON PHYSICIAN PROVIDER | A | -227468 | DEPARTMENT OF MEDICINE | 19.02 | 0 |
| 37.61 NON PHYSICIAN PROVIDER FRINGE | A | -56867 | Employee Benefits | 5. | 0 |
| 37.62 NON PHYSICIAN PROVIDER | A | -703559 | DEPARTMENT OF SURGERY | 19.03 | 0 |
| 37.63 NON PHYSICIAN PROVIDER FRINGE | A | -175890 | Employee Benefits | 5. | 0 |
| 37.64 NON PHYSICIAN PROVIDER | A | -33830 | DEPARTMENT OF PEDIATRICS | 19.04 | 0 |
| 37.65 NON PHYSICIAN PROVIDER FRINGE | A | -8458 | Employee Benefits | 5. | 0 |
| 37.66 NON PHYSICIAN PROVIDER | A | -37255 | Operating Room | 37. | 0 |
| 37.67 NON PHYSICIAN PROVIDER FRINGE | A | -9314 | Employee Benefits | 5. | 0 |
| 37.68 NON PHYSICIAN PROVIDER | A | -301294 | Clinic | 60. | 0 |
| 37.69 NON PHYSICIAN PROVIDER FRINGE | A | -75324 | Employee Benefits | 5. | 0 |
| 37.70 SURGERY PHYS FEES | A | -10002 | DEPARTMENT OF PSYCHIATRY | 19.06 | 0 |
| 37 71 CLINIC PHYS COMP | A | -34818 | Clinic | 60. | 0 |
| 37.72 PEDI FEES | A | -181023 | Clinic | 60 | 0 |
| 37.73 MIRIAM DRS | A | 245291 | Laboratory | 44. | 0 |
| 37 74 MIRIAM DRS | A | 5270 | Employee Benefits | 5. | 0 |
| 37.75 ORGAN ACQ COST | A | -137600 | Kidney Acquisition | 83. | 0 |

Rhode Island Hospital
Non Physician Providers
FYE 09/30/99

| | | | | Salary | Fringe | B-1 |
|---|---|---|---|---|---|---|
| | | | Worksheet A-8 Adj | 227,468 | 56,867 | 3.58 |
| HCFA # | CC# | HCFA # | Description | Salary | Fringe | FTE |
| 19.02 | 4024 | 19.02 | Phys Assist | 63,978 | 15,995 | 1.00 |
| | 4083 | 19.02 | Nurse Pract | 109,840 | 27,460 | 1.62 |
| | 4140 | 19.02 | Nurse Pract | 53,650 | 13,413 | 0.96 |

Rhode Island Hospital
Non Physician Providers
FYE 09/30/99

| | | | | Salary | Fringe | B-1 |
|---|---|---|---|---|---|---|
| | | | Worksheet A-8 Adj | 703,559 | 175,890 | 10.00 |
| HCFA # | CC# | HCFA # | Description | Salary | Fringe | FTE |
| 19.03 | 4046 | 19.03 | Nurse Pract | 64,046 | 16,012 | 1.00 |
| | 4063 | 19.03 | Nurse Pract | 53,689 | 13,422. | 1.00 |
| | 4063 | 19.03 | Nurse Pract | 69,137 | 17,284 | 1.00 |
| | 4063 | 19.03 | Phys Assist | 362,303 | 90,576 | 4.46 |
| | 4085 | 19.03 | Nurse Pract | 63,215 | 15,804 | 1.03 |
| | 4085 | 19.03 | Phys Assist | 91,169 | 22,792 | 1.51 |

Rhode Island Hospital
Non Physician Providers
FYE 09/30/99

| | | | | Salary | Fringe | B-1 |
|---|---|---|---|---|---|---|
| | | | Worksheet A-8 Adj | 33,830 | 8,458 | 0.53 |
| HCFA # | CC# | HCFA # | Description | Salary | Fringe | FTE |
| 19.04 | 6347 | 19.04 | Nurse Pract | 33,830 | 8,458 | 0.53 |

Rhode Island Hospital
Non Physician Providers
FYE 09/30/99

| | | | | Salary | Fringe | B-1 |
|---|---|---|---|---|---|---|
| | | | Worksheet A-8 Adj | 37,255 | 9,314 | 0.54 |
| HCFA # | CC# | HCFA # | Description | Salary | Fringe | FTE |
| 37 | 3137 | 37.00 | Nurse Pract | 37,613 | 9,403 | 0.55 |
| | 3137 | 37.00 | Phys Assist | (358) | (90) | -0.01 |

Rhode Island Hospital
Non Physician Providers
FYE 09/30/99

| | | | | Salary | Fringe | B-1 |
|---|---|---|---|---|---|---|
| | | | Worksheet A-8 Adj | 301,294 | 75,324 | 4.70 |
| HCFA # | CC# | HCFA # | Description | Salary | Fringe | FTE |
| 60 | 2420 | 60.00 | Nurse Pract | 244,778 | 61,195 | 3.82 |
| | 2463 | 60.00 | Nurse Pract | 37934 | 9,484 | 0.59 |
| | 2465 | 60.00 | Nurse Pract | 18,582 | 4,646 | 0.29 |

# P-9

# PRRB-DEC, MED-GUIDE 1979-1 MED-GUIDE-TB ¶29,667, PRRB DECISION--ALLOCATION OF COSTS IN RETIREMENT COMMUNITY--USEFUL LIFE OF DEPRECIABLE ASSETS--NURSING SERVICE REVENUE--SUPERVISORY ALLOWANCE FOR PHYSICAL THERAPY SERVICES, *PRRB Hearing Dec.* , (Mar. 15, 1979)

*Copyright © 2002, CCH INCORPORATED. All rights reserved.*

## PRRB DECISION--ALLOCATION OF COSTS IN RETIREMENT COMMUNITY--USEFUL LIFE OF DEPRECIABLE ASSETS--NURSING SERVICE REVENUE--SUPERVISORY ALLOWANCE FOR PHYSICAL THERAPY SERVICES

***PRRB Hearing Dec.*** , Mar. 15, 1979 No. 79-D14,, (cost reporting periods ending December 31, 1975 and 1976). Highland Farms Health Care Center (Black Mountain, N. C.) v. Blue Cross Assoc./Blue Cross and Blue Shield of North Carolina.

**Provider reimbursement--Cost data and cost finding--Distribution of general services costs to nonallowable cost centers--Retirement community with SNF.--**
Where, in a case involving a comprehensive retirement community consisting of, among other things, a skilled nursing facility and residential apartments, an intermediary held that various overhead costs should be allocated between the SNF and the apartments on the basis of square feet because of a lack of accurate records, the Board held as follows: housekeeping and maintenance supply costs that were identifiable could be directly allocated to either the provider or the apartments, but residual housekeeping and maintenance supply costs (unidentifiable or general items) had to be allocated on the basis of square feet; maintenance salaries also had to be allocated based on square feet; but the costs of electricity (heating and lighting) could be directly allocated to the two areas on the basis of kilowatt hours.

Back reference: ¶6671.

**Provider reimbursement--Depreciation--Useful life of depreciable assets--Structure housing SNF--Carpet and kitchen equipment.--**
A block and brick structure, with a wood frame roof, that housed a skilled nursing facility could continue to be depreciated over a 33-year life, rather than a 40-year life, as was held by an intermediary. In addition, the provider could depreciate carpet and kitchen equipment over a ten-year life.

Back reference: ¶4695.

**Provider reimbursement--Cost data and cost finding--Nursing service revenue, effect of.--**
Revenue received by a skilled nursing facility that was part of a retirement community for nursing services furnished to residents of apartments had to be used to reduce the facility's nursing service cost. The provider was unable to determine the actual cost of providing the nursing service to the residents of the apartments. Therefore, Section 2328 of the *Provider Reimbursement Manual* requires that, where cost centers are not maintained for unrelated patient care functions, the income derived therefrom must be used to reduce the provider's costs.

Back reference: ¶6670.

**Provider reimbursement--Therapy services furnished by outside suppliers--Supervisory allowance.--**
Where a skilled nursing facility had an arrangement with an organization rendering physical therapy services and, frequently, there were two licensed physical therapists and two therapy aids on duty, a supervisory allowance could be included in allowable costs providing there were two LPTs on duty at the same time.

Back reference: ¶5849D-52.
*Issue:*

Whether the Intermediary's method of determining the cost of the Skilled Nursing Facility is correct?

*Statement of Facts:*

The provider is a proprietary 60-bed Skilled Nursing Facility (SNF), of which 40 beds (distinct part) were certified to participate in the Medicare program until May 1, 1975, at which time the entire 60 beds were certified. Medicare utilization was about 41 and 42 percent for the 1975 and 1976 cost years, respectively. The provider is a division of a comprehensive retirement community.

The provider began operations as a 60-bed Medicare SNF in November 1971, with the first cost year covering the period ending December 31, 1971. In November 1973, the residential division of Highland Farms, Inc., started leasing apartments. Originally 20 apartments were occupied, followed by 20 more in January 1974, 20 more in February and March, with the central dining facility completed on April 1, 1974. In August 1976, another 12 apartment units came on line, followed by the balance of 52 in September, October, November and December. By January 1977, all 124 apartments were completed and occupied. During 1978, 16 houses are being completed. It is expected that over the next few years, there will be constructed about 100 more house and condominium units, a public restaurant and small motel, as well as a 40-room residential hotel. In every case, the additional facilities are, or will be, housed in separate and distinct buildings from the original health care facility.

The Intermediary audited the provider's cost reports for the years ended December 31, 1975 and 1976, and made several adjustments. The majority of the adjustments pertain to the allocation of costs between the SNF and the apartments. These adjustments reduced Medicare reimbursement about $10,000 and $13,500 for the 1975 and 1976 cost years, respectively. The provider did not accept the subject audit adjustments and filed a timely request for a hearing before the Board. A hearing was held on November 28, 1978.

*Citation of Applicable Law, Regulations, and Program Reimbursement:*

I. *Regulations 42 CFR 405 Appendix*

*Regulation No. 5, Subpart D*

1. §405.415 Depreciation: Allowance for Depreciation Based on Asset Costs ... A [omitted, see ¶4501]

2. §405.453 Adequate Cost Data and Cost Finding ... B [omitted, see ¶6325]

3. §405.432 Reasonable Cost of Physical and Other Therapy Services Furnished Under Arrangements ... C [omitted, see ¶5894D]

II. *Program Instructions*

A. *Provider Reimbursement Manual (HIM-15-1)*

1. §104.17 Useful Life of Depreciable Assets ... D [omitted, see ¶4695]

2. §1412.4 Administrative or Supervisory Responsibility ... E [omitted, see ¶5849D-52]

3. §2150.3B Costs Directly Allocated to Components ... F [omitted, see ¶5999U-3]

4. §2202.3 Apportionment ... G [omitted, see ¶6046A]

5. §2312 Changing Bases for Allocating Cost Centers or Order in Which Cost Centers are Allocated ... H [omitted, see ¶6470]

6. §2320 Cost Finding Schedule ... I [omitted, see ¶6480]

B. *Blue Cross Association Administrative Bulletin* No.1160 J [see "Appendix" below]

*Contentions of the Parties:*

*Provider*

*1. Allocation of Costs*

The provider contends that the Intermediary's method of determining cost for the health care center is not correct and inequitable. Different statistics should be used to allocate the costs of housekeeping and maintenance supplies, maintenance wages, and electricity between the provider and apartments.

The provider argues that Highland Farms is a multi-faceted complex, one portion of which is a licensed provider. Costs associated with general overall operations should be allocated to the provider on the basis of generally accepted cost accounting techniques. On the other hand, the Intermediary insists that such allocations be made according to Regulations governing apportionment of costs between classes of patients. The provider believes the Intermediary has misinterpreted the Regulations. The retirement community in its entirety is not a homogenous provider. Tenants who reside in apartments or houses are not patients. The rigid system of cost apportionment between classes of patients receiving similar services does not produce reasonable results when applied to other groups of people receiving unlike degrees and variety of services. Moreover, the provider argues that allocation of costs requires two basic elements: (1) Costs must be classified "on the basis of similarities of nature, attributes or relations", i.e., homogeneity; and (2) the allocation basis must be reflective of the functions performed and relate the costs to the product or service in a logical way. The provider states that the Intermediary has grouped all housekeeping and maintenance supplies in a single category. As mentioned herein, there is little homogeneity in such a grouping. Moreover, the Intermediary's allocations of such costs on a basis of square footage also fails to recognize the differences in housekeeping and maintenance service supplied to the various portions of the total complex. The provider believes that such a grouping and allocations by the Intermediary fails both tests mentioned herein.

The provider also contends that the Intermediary's allocations of maintenance wages on the basis of square footage also fails both tests. Moreover, the Intermediary's allocation of electricity (heating and lighting) on the basis of square footage is also incorrect. There is no uniformity of usage as between the provider and apartments.

*2. Depreciation*

The provider contends that AHA depreciation guidelines show that useful life for most land improvements is at 30 years or less and fixed equipment is at 20 years or less; therefore, a block & brick structure, with a wood frame roof, landscaped and equipped, has an indicated useful life of 20 to 25 years according to AHA guidelines. The provider also contends that it can find no realistic basis for the Intermediary's contention that a 40-year life should be used to depreciate the structure. Moreover, the Intermediary's disallowance of depreciation of carpet and kitchen equipment based upon a ten-year life is also contrary to AHA depreciation guidelines and Program Policy.

*3. Nursing Service Revenue*

The provider contends that the use of nursing service revenue to offset cost is not correct. Any allocation system for any item must be at least consistent within itself. Cost may be compared to cost, revenue to revenue, but certainly not cost to revenue. The provider believes that any offset to nursing service cost for services performed for residents of apartments should be on the basis of costs.

*4. Physical Therapy Services*

The provider contends that the Intermediary's adjustment is the result of misclassification of a supervisory LPT; and, therefore, should be reversed.

*Intermediary*

*1. Allocation of Costs*

The Intermediary contends that the provider is unable to accurately allocate the cost of housekeeping and maintenance supplies, maintenance wages, and electricity directly to the provider and the apartments. Therefore, the subject costs must be allocated based upon the only available auditable statistic which is square feet. The Intermediary states that the "cardinal principle" that deals with cost allocations issues is §405.453 of the Regulations, which requires providers to maintain auditable statistics to support their claims for costs. The Intermediary interprets this to mean that "a statistic must have some basis in fact; somebody's guess is not sufficient".

*2. Depreciation*

The Intermediary acknowledges the fact that a provider can change the life of assets; and that Program Instructions state that the undepreciated balance at the time of change must be depreciated over the remaining life of the assets. However, the Intermediary contends if such items as carpet and kitchen equipment are removed from the aggregate cost of the provider's facility, the remaining useful life of the facility must be examined. The Intermediary also contends that the building should be depreciated over a remaining life of 36 years (total life of 40 years) in accordance with AHA and IRS guidelines.

*3. Nursing Service Revenue*

The Intermediary contends that revenue received for nursing services furnished to residents of the apartments is a proper offset to reduce the provider's allowable cost. The Intermediary states that the provider was not able to document the actual cost to provide the subject nursing service; therefore, it had no alternative but to reduce the provider's allowable cost by the amount of revenue received for these services.

*4. Physical Therapy Services*

The Intermediary contends that the provider is not entitled to claim a supervisory allowance for the owners of a company which provides physical therapy services under arrangements; and the licensed full time therapist who works at the provider's site. Program Instructions indicate that one supervisory allowance for each provider is permitted unless there is an extraordinary large physical therapy department. The Intermediary argues that this is not the case.

*Conclusions and Findings:*

The Provider Reimbursement Review Board, after consideration of the facts, the parties' contentions, and evidence presented, concludes and finds:

*1. Allocation of Costs*

The Board notes that the provider reviewed all invoices pertaining to housekeeping and maintenance supplies. Moreover, the provider was able to identify and allocate certain items relating directly to either the health care facility or the apartment areas. The cost of unidentified or general items were then allocated on the basis of identifiable direct costs to the two areas. The Board finds that the cost of housekeeping and maintenance supplies which the provider was able to identify and which were allocated to the health care center and apartment areas acceptable. On the other hand, the Board finds the provider's method of allocating the residual costs (unidentifiable and general) unacceptable and represents nothing more than an "estimate," which is contrary to §405.453 of the Regulations. Therefore, the residual housekeeping and maintenance supply costs should be allocated based upon "square footage", which is in consonance with Program Instructions. Likewise, the Board can not accept the provider's allocation methodology pertaining to maintenance salaries: These costs must also be allocated based upon "square footage".

With respect to the allocation of electricity (heating and lighting), the Board is of the opinion, that the provider's methodology of assignment of cost to the health care and apartment areas based upon the unit rate of kilowatt hours times the kilowatt hour consumption in each area is a valid one. Therefore, "square footage" should not be used as a basis to allocate electricity cost.

*2. Depreciation*

The Board finds that the provider is entitled to depreciate the carpeting and equipment over a 10-year life and continue to depreciate the health care structure of a 33-year life in accordance with §405.415 of the Regulations and AHA depreciation guidelines. The Board can not accept the Intermediary's proposal that a 40-year life be used to depreciate the health care structure because most certainly the SNF provider facility in the instant case can not be compared to a hospital structure.

*3. Nursing Service Revenue*

The Board finds that nursing service revenue must be used to reduce the provider's nursing cost. Evidence presented clearly demonstrates that the provider was unable to determine the actual cost of providing the nursing service to the apartment residence which is unrelated to patient care. Section 2328 [¶6670] (HIM-15) requires that, where cost centers are not maintained for unrelated patient care functions, the income derived must be used to reduce provider costs.

*4. Physical Therapy Services*

The Board notes there is an arrangement with a professional association of Licensed Physical Therapists (LPT's) which provides physical therapy services to the provider. Moreover, it is noted that the Intermediary and provider agree that the owners of the Physical Therapy Association performed 961/2 hours of patient care classified as supervisory and appropriate compensation was allowed. In addition to the owners, the provider classified the full-time LPT as a supervisor and

computed the compensation of this individual as such. On the other hand, the Intermediary treated the individual as a regular LPT and allowed no additional compensation for supervisory duties, even though there was another LPT frequently on duty and two therapy aides. The Board finds that the Intermediary's adjustment is unreasonable, and that an allowance should be made for "one" supervisor as long as there are two LPT's on duty at the same time. The evidence demonstrated that, in the absence of the owners of the Physical Therapy Association, one on site LPT does supervise the department operation on a day to day basis.

*Decision:*

*1. Allocation of Costs*

a. The provider is entitled to directly allocate the housekeeping and maintenance supply costs it was able to identify. The residual costs must be allocated based upon "square footage". The Intermediary's adjustment is modified.

b. The provider must allocate the maintenance salaries based upon "square footage". The Intermediary is affirmed.

c. The provider is entitled to directly allocate electricity based upon kilowatt hours. The Intermediary's adjustment is reversed.

*2. Depreciation*

The provider is entitled to depreciate the carpeting and equipment over a 10-year life and continue to depreciate the health care structure over a 33-year life. The Intermediary is reversed.

*3. Nursing Service Revenue*

The provider must reduce nursing service cost by nursing revenue received. The Intermediary is affirmed.

*4. Physical Therapy Services*

The provider is entitled to "one" supervisory allowance as long as there are two LPT's on duty at the same time. The Intermediary's adjustment is modified.

**Appendix**

*BCA Administrative Bulletin* No. 1160,

June 23, 1977

*To:* Directors of Federal Programs--List 35 Reimbursement Managers--List 35C

*From:* Merritt W. Jacoby, Vice President Medicare and CHAMPUS Administration

*Subject:* Medicare Cost Reporting: Use of Direct Costing in Combination Method of Apportionment with Simplified Cost Finding

The purpose of this Bulletin is to advise Plans of the current status of the use of direct costing in the simplified cost finding method. This method is mandated for all hospitals and hospital-skilled nursing facility complexes with less than 100 beds, and for all free-standing skilled nursing facilities.

*The Issue*

Since the promulgation of cost reporting forms SSA-2570, there has been concern that strict application of the simplified cost finding instructions may result in inappropriate allocation of costs between the various cost centers or components of a provider/provider-complex. In order to alleviate these concerns, some providers filed cost reports in which certain costs (e.g., laundry, utilities, telephone, etc.) were directly charged to the using cost center, and not included in the cost finding allocations. This course of action was based upon that instruction to SSA-2570 which states:

> Where in the normal accounting process, and based on appropriate statistics and records, providers make direct charges to departments for various overhead costs, for which separate provision has been made in the trial balance, reclassifications of the costs to the general service cost centers listed on page 2 are not necessary.

Depending upon factors such as the Plan's interpretation of the SSA-2570 instructions, the validity of the basis used to perform the direct costing, the accuracy of the results, etc., these cost reports may have been accepted by the Plan or revised in strict accordance with SSA-2570 instructions. Until recently, appeals by the provider in this regard, either before the PRRB or BCA hearing officer, have generally found in favor of the Plan, and have upheld the elimination of direct costing.

However, in response to actual cases and Congressional inquiry, BHI has recently indicated their policy regarding the use of direct costing with simplified cost finding. The pertinent events are set out below.

*Background*

1. In November 1976, a memorandum was issued by Mr. Tierney to the Bureau of Health Insurance Regional Office at Dallas, Texas [1977 Transfer Binder ¶28,502], outlining specific action to be taken in that region with respect to certain cost reports filed on cost reporting forms SSA-2570.

While BCA was aware of this document, it was never released to Plans, because it represented an internal BHI communication and had application only to the Dallas Regional Office. This memorandum is referred to hereafter as "the Bureau Director's Memorandum."

2. On March 11, 1977, a mailing was distributed to all Reimbursement Managers, which enclosed a letter from Mr. Tierney to a member of the House of Representatives. In summary, this letter indicated what options were available to providers required to file cost reporting form SSA-2570, when they had auditable data for overhead allocations, not explicitly provided for in the form SSA-2570 instructions.

3. On the same day (March 11, 1977), a letter was sent to Mr. Blumenthal, Deputy Director of Program Policy for the Bureau, which:

(a) Advised him of our 3/11 mailing to all Plans;

(b) Requested his approval of a draft Administrative Bulletin which would provide Plans with an appropriate course of action to be taken based on Mr. Tierney's letter.

4. Since that first mailing to all Reimbursement Managers, we have become aware of four additional letters and memoranda issued by the Bureau and its Regional Offices to members of Congress, Providers, Blue Cross Plans, and Commercial Intermediaries (at least one).

*Current Developments*

Because of the potentially widespread impact of these letters and changes in policy on Plan audit and settlement activity, Blue Cross Association has sought specific direction from BHI. A wire requesting answers to questions regarding retroactivity, adverse appeal decisions, confidence levels required in provider's cost finding data, etc., was sent to the Deputy Director of BHI on March 22, 1977.

On May 19, 1977, a response was received to this wire. The substance of the BHI response is included below. The letter addresses only those questions specifically asked in the wire of March 22, and the responses are quoted in their entirety.

1. Are estimates (of the bases for direct costing) acceptable under any circumstances?

No. The program's emphasis has always been that costs should be allocated on an appropriate, measurable basis. Allocable costs is defined in the *Provider Reimbursement Manual,* Section 2302.4 [¶6345], as "An item or group of items of cost chargeable to one or more objects, processes, or operations in accordance with cost responsibilities, benefits received, or other *identifiable measure* of

application or consumption." (Italics added) Furthermore, in the Bureau Director's memorandum, intermediaries were only instructed to accept the use of "estimates" in allocations to preclude the reopening of settled cost reports where provider had already used "some estimates" in direct costing allocations and "the estimates did not have a material effect on the final outcome."

2. What does "demonstrable evidence that the provider was using this accounting methodology consistently on its books" mean? (Quoted from the documents referred to in the background material.)

That there are auditable and identifiable records, documentation, etc., which indicate that the provider as part of its normal accounting procedures was making periodic entries on its books during the cost reporting period, as well as during prior periods, assigning a proportionate share of a specific cost to a specific cost center or entity for purposes other than Medicare reimbursement.

3. What if the provider did not record allocations on its books because the intermediary had specifically prohibited this approach based on prior notification from the intermediary?

The last paragraph on page 3 of the Bureau Director's memorandum may be used to resolve problems in this area. It states, "If, however, a provider comes forward and can furnish reliable data justifying additional reimbursement through allocation or direct assignment of costs, you should reexamine the cost report if the time limit for reopening has not expired."

4. Will the Bureau of Health Insurance inform providers about this change in policy?

Providers will be informed of the change in policy through the issuance of an impending revision to the *Provider Reimbursement Manual.*

5. Can adverse appeal decisions be reopened? How is this to be accomplished?

Detailed instructions and procedures pertaining to the reopening of appeal decisions are found in the *Part A Intermediary Manual*-- Part 2 [HIM-13-2), Section 2631 [¶13,510.33], Reopening and Correction. Briefly, this section provides that Intermediary Hearing Officer and Hearing Officer Panel decisions, Provider Reimbursement Review Board decisions and the Secretary's decisions may on the initiative of the appropriate authority (i.e., Hearing Officer, Secretary, etc.), or in response to a written request of the provider, be reopened to reexamine or question the correctness of a determination or decision otherwise final. Additionally, decisions of a hearing officer or panel may also be reopened on the initiative of the Bureau of Health Insurance alone.

6. If statistics are not available for past periods, what methods, if any, could be used to permit estimates for past periods?

The use of estimates in situations such as this is not acceptable. As noted in our reply to question one above, it was the intent of the program to limit the acceptance of estimates to those reports where direct costing had already been applied by a provider, and where the vast majority of the allocations used are supportable, to preclude the reopening of such reports. Furthermore, adoption of this policy was made with the understanding that providers already had and were using reliable data for allocating costs under this methodology. Accordingly, as indicated on page 3 of the memorandum, "If reliable data are available . . . the allocation bases specified on . . . the SSA-2570 form must be used."

7. What affect will this change in policy have on cost reporting forms SSA-2551? Presumably, these will be subject to the same criteria?

The purpose of the Bureau Director's memorandum was to clarify instructions to the SSA-2570 form. However, even though these instructions became obsolete upon the publishing of form SSA-2551, the policies contained therein will continue and are applicable to all providers now required to file cost reports using the form SSA-2551.

NOTE: Three of the questions directed to the Bureau related to administrative issues and have been omitted.

*Plan Action*

At this time, no formal instructions have been issued by the Bureau of Health Insurance informing intermediaries of the course of action to be taken with settled, filed or to be filed cost reports. Until formal instructions are issued, we advise Plans to adopt the following procedures:

1. Cost reports should be reopened only upon request of the provider.

2. Acceptance by the Plan of reopened and reworked cost reports (based upon the changing BHI policy) should depend on the validity of the bases used to directly assign costs. In this regard, arguments presented by a provider that the data necessary is not available because the intermediary prohibited its use in simplified cost finding does not waive any of the data criteria. Justification for this argument lies in the fact that the auditable and identifiable records, documentation, etc., needed to perform direct costing were being maintained by the provider as part of its normal accounting procedures.

3. Where a provider has appealed an adjustment to its cost report based upon a Plan's rejection of direct costing, the Plan has no jurisdiction over any request for a reopening. Any provider inquiries regarding this situation should be redirected to the appropriate hearing officer(s).

4. Although it is impossible to produce an exhaustive list of the reclassifications possible, some of the more common are:

(a) Utility costs--direct costing would be appropriate where two or more cost entities separately maintain their own meters for utilities. The utility cost of each entity may have to be further allocated to using cost centers within each entity based upon "auditable reliable data."

(b) Laundry and linen--the cost of this operation can be allocated on the basis of actual pounds used in each entity or department. Actual pounds used can be obtained either through departmental requisitions or weight of laundry used.

(c) Telephone costs--telephone costs can be assigned to entities or departments based upon charges billed by the telephone company. Assignment of these costs must comply with the requirements of Section 2106 [¶5876] of HLM-15-1.

(d) Salary costs--salary costs can be assigned based upon the time records used by the payroll department (time cards are not necessarily required, but other types of times records would be necessary.) Employees whose salaries could possibly be directly assigned include, but are not limited, to, nursing staff and supervision, maintenance personnel, housekeeping, and interns and residents.

(e) Fringe benefits--fringe benefits can be directly assigned if their cost is expressed as a percentage of the employees' pay (e.g., FICA), or as an itemized (by employee) invoice such as health insurance premiums. Blanket policies such as group health would not qualify.

(f) Depreciation--depreciation and other capital related costs can be directly assigned based upon departmentalized ledgers. Building and space cost (rent or lease) will be allocated within each entity or over the entire facility based on square feet.

In general, the bases of direct assignment must be either actual dollars or valid statistics. To qualify as valid, statistics must be maintained on a continuing basis throughout the cost reporting period and be auditable. Estimates or retroactive time studies are not acceptable statistics.

However, where the Plan is aware that it had specifically prohibited a provider that would otherwise qualify under the criteria set forth herein then the Plan should inform the provider of the applicable policy.

This "awareness" could arise from direct knowledge of a situation (without reference to previous records) or as a result of a review of each provider's status on prior cost reports in connection with the desk review and audit of the current cost report.

Any questions regarding this material should be referred to the appropriate team Senior Manager, Plan Reimbursement/Settlement Activities, BCA.

*Copyright © 2002, **CCH INCORPORATED**. All rights reserved.*

# P-10

# CMS-DEC, MED-GUIDE 1979-1 MED-GUIDE-TB ¶29,706, HCFA ADMINISTRATOR DECISION--ALLOCATION OF UTILITY COSTS IN RETIREMENT COMMUNITY--ADEQUACY OF COST DATA, *HCFA Administrator Decision*, , (May 12, 1979)

*Copyright © 2002, CCH INCORPORATED. All rights reserved.*

## HCFA ADMINISTRATOR DECISION--ALLOCATION OF UTILITY COSTS IN RETIREMENT COMMUNITY--ADEQUACY OF COST DATA

*HCFA Administrator Decision*, May 12, 1979.

**Provider reimbursement--Cost data and cost finding--Allocation of utility costs to allowable and non-allowable areas--Adequacy of cost information.--**
Statistics on electrical consumption by an SNF for the years before the addition of other parts of a retirement community were adequate to support direct cost allocation between the SNF and residential units. Even though the SNF and the residential units were billed as one entity and the recommended allocation method was on a square-foot basis, direct allocation was permitted because there was no reason to believe that kilowatt-hour consumption by the SNF would have decreased.

Back references: ¶6420, ¶6671.

**PRRB Dec. No. 79-D14 at ¶29,667 is affirmed.**

This case is before the Administrator, Health Care Financing Administration, for review on his own motion of the decision entered on March 15, 1979, by the Provider Reimbursement Review Board. The review is undertaken pursuant to Section 1878(f)(1) of the Social Security Act, as amended [42 USC 1395oo]. The Board's decision consisted of four separate parts, Part 1 being divided into Subparts a, b, and c. The Intermediary requested review of Part 1c of the Board's decision. The provider also submitted comments concerning Part 1c. Accordingly, the case is now before the Administrator for final administrative decision.

Part 1c of the Provider Reimbursement Review Board decision was that: "The provider is entitled to directly allocate electricity based upon kilowatt hours. The Intermediary's adjustment is reversed". In excepting to the Board's decision, the Intermediary wrote that square footage was the only valid and definite statistic which could have been used for direct allocation of costs. This was because the provider did not have separate utility meters and used statistics based on varying factors. The Intermediary based its position on Blue Cross Association's *Administrative Bulletin* (AB) No. 1160.

The provider commented that its method of direct allocation was reasonable and consistent with generally accepted cost accounting principles. The provider referred to Sections 2336.2A [¶6810] and 2150.3B and C [¶5999V-3] of the *Provider Reimbursement Manual* (HIM-15) in support of its methodology. The provider stated it has had no structural, mechanical, or operational changes since November 1, 1971. Therefore, it is neither equitable, nor reasonable to expect its energy consumption

to have declined since then. As part of its comments, the provider listed numerically its allocation of electricity costs, and compared this to the Intermediary's method.

The entire record which was before the Board, including all correspondence, position papers, and exhibits submitted by the parties, and the transcript of oral hearing, has been examined. The Board's decision has been carefully reviewed. The comments received after entry of the Board's decision have been made part of the record and thoroughly reviewed.

The provider allocated electricity costs between its facility and apartment complex based on kilowatt hour consumption times the unit cost per kilowatt hour. Since its facility and apartment complex did not have separate electric meters, the provider used records of kilowatt usage from prior years to statistically determine kilowatt usage in the cost years at issue. The provider adjusted the data for temperature variations measured by degree days, between the year from which the data was gathered and the cost years under appeal.

The Intermediary objected to the provider's method of allocation, stating it was improper under AB No. 1160. This *Administrative Bulletin,* dated June 23, 1977, was issued to advise the various Blue Cross Plans of the current status of direct costing by providers. It instructs against the use of estimates for direct allocation.

The Board held the provider is entitled to directly allocate electricity based on kilowatt hours. The Board held that the provider's methodology was valid and square footage need not be used to allocate electricity. After review of the record in its entirety, the Administrator finds that there is no basis for reversing this part of the Board's decision.

Under 42 CFR 405.453, providers are required to furnish adequate cost data. This data must be based on financial and statistical records capable of verification. The evidence in this case established that the provider used records of actual kilowatt usage in prior cost years, in the nursing facility alone, as the statistical base for direct cost allocation. These records were readily available and easily verified. The only adjustment to the prior data was for the readily verifiable difference in degree days between the cost years.

The Board found the evidence convincing that the provider's statistical basis for direct allocation was consistent with the regulations and was more accurate than the basis proposed by the Intermediary. Although the Board is bound to afford great weight to interpretive rules and general statements of policy, it is not bound to follow such statements. The Board did not choose to follow *Administrative Bulletin* No. 1160, and it was not bound to do so.

The Board is the trier of facts in this case. No prejudicial error has been found in the course of this final administrative review. The decision is binding only on the evidence of record and on the cost years involved in this case. The Board's decision as to Part 1c and the other parts of the Board's decision is affirmed.

*Copyright © 2002, **CCH** INCORPORATED. All rights reserved.*

# P-11

# PRRB-DEC, MED-GUIDE 1988-1 MED-GUIDE-TB ¶36,646, Mecklenberg Home Health, Inc. (Charlotte, N.C.) v. Blue Cross and Blue Shield of North Carolina., PRRB Hearing , (Sep. 03, 1987)

*Copyright © 2002, CCH INCORPORATED. All rights reserved.*

**Mecklenberg Home Health, Inc. (Charlotte, N.C.) v. Blue Cross and Blue Shield of North Carolina.**

**PRRB Hearing** Dec. No. 87-D99, Sept. 3, 1987, (cost reporting period ending Sept. 30, 1983)

**Medicare: Allocation of Cost**

**Provider reimbursement--Cost data and cost finding--Discrete cost finding--Allocation of costs by usage and square footage--Inadequate documentation.--**
A home health agency that had used the discrete costing method to allocate the cost of data processing services sold to other HHAs based on usage and square footage was required by the intermediary to use the revenue offset method to allocate costs. The intermediary eliminated the non-reimbursable cost center because it could not verify the accuracy of the provider's allocation. The data processing activity did not qualify as a cost center because there was no recording of the costs on a regular basis throughout the period and the square foot statistical base did not accurately measure the service rendered. Therefore, the intermediary correctly reclassified the data processing service costs to the administrative and general cost center and offset the sales income received against total A&G costs.

See ¶6420.40, ¶6475A, ¶6670.75.
*Issue:*

Whether the Intermediary's adjustments eliminating the nonreimbursable cost center and offsetting the applicable revenue against allowable cost were proper?

*Summary of Facts:*

The provider, a home health agency (HHA), sold data processing (DP) services to other HHAs in its area using the same DP facility which served its own administrative and general (A&G) needs. Approximately 35% of the total DP costs in the A&G cost center was allocated to a non-reimbursable cost center the provider established on its cost report for the sold DP services. The Intermediary eliminated the non-reimbursable cost center because it could not verify the accuracy of the allocation. It reclassified the allocated sold DP costs back to the A&G cost center and offset the sales income received against total A&G costs. Those adjustments reduced Medicare reimbursement by approximately $11,000.

The provider appealed the Intermediary's adjustments pursuant to 42 CFR 405.1835ff and has met the jurisdictional requirements therein.

*Provider's Contentions:*

The provider contends that the 35% allocation of the DP cost to the non-reimbursable cost center was reasonable, auditable and verifiable. The provider agrees that it did not furnish documentation at the time of the audit to support the allocation. However, it now asserts that the basis of the allocation was usage and square footage. It asks that the Intermediary be directed to examine the allocation method (Provider's Post Hearing Brief p. 17, Table II) to ascertain whether it is consistent with the regulations.

The provider asserts that the facts justify a departure from the HIM 15-1, Sec. 2313.1 [¶6475A] requirement to use machine time data to fragment A&G. Most of the equipment was "dedicated" (100% usage) to either the HHA or to its outside customers. Since the 35% allocation was based on measurable areas occupied by the machines, the provider argues that the square footage statistic represents a reasonable alternative allocation basis to the machine time statistic.

Finally, the provider argues that its allocation method yields a more accurate result than the Intermediary's revenue offset method. The provider believes that the imperfections cited by the Intermediary are not material and urges that the reasoning in *Rhode Island Hospital v. Blue Cross and Blue Shield, PRRB Dec.* No. 85-D 69 (July 1, 1985) should be applied in this case.

That decision stated:

> Considering the lack of materiality of the costs in question, such documentation, although not perfect, is vastly superior to the mechanism employed by the Intermediary and has the added virtue that it does not distort the measurement of costs nor unlawfully shift costs from Medicare to other payors.

*Intermediary's Contentions:*

The Intermediary contends that, although *Provider Reimbursement Manual* (PRM HIM-15-1) Sec. 2313.1 requires machine time to allocate DP, it would accept another basis so long as it was verifiable and reasonably related to the manner in which the DP costs were incurred. However, data submitted by the provider do not meet that standard or the requirements of 42 CFR 405.406 [redesignated 413.20], 42 CFR 405.453 [redesignated 413.24] and the relevant PRM instructions. The provider's method is not auditable or verifiable as required by those regulations.

The letter from the outside consulting firm (Provider Exhibit H) does not support the allocation because it is an unauditable estimate. The square footage analysis (Provider Exhibit A) is not accurate because it relies upon pieces of equipment which were not the same size. Also, provider testimony

indicated that various machines were not dedicated but had differing amounts of shared usage. Furthermore, common space was not accounted for.

Finally, the Intermediary asserts that PRM section 2328 [¶6670], which states that ". . . where cost centers are not maintained . . . the income derived from them must be used to reduce total hospital costs . . .," requires a revenue offset adjustment because a separate DP cost center had not been maintained.

*Citation of Applicable Law, Regulations and Program Instructions:*

1. *Regulations--42 CFR 405, Subpart D:*

a. Sec. 405.406 [redesignated 413.20]--Financial Data and Reports ... [¶6323]

b. Sec. 405.451 [redesignated 413.9]--Cost Related to Patient Care ... [¶5850]

c. Sec. 405.453 [redesignated 413.24]--Adequate Cost Data ... [¶6325]

2. *Program Instructions--Provider Reimbursement Manual (HIM 15-1):*

a. Sec. 2304--Adequacy of Cost Information ... [¶6420]

b. Sec. 2307--Direct Assignment of General Service Cost ... [¶6462]

c. Sec. 2313--Changing Bases for Allocating Cost Centers or Order in Which Cost Centers are Allocated ... [¶6475]

d. Sec. 2328--Distribution of General Services Costs to Nonallowable Cost Areas. ... [¶6670]

*Findings and Conclusions:*

The Provider Reimbursement Review Board (Board), after consideration of the facts, parties' contentions, and evidence presented, finds and concludes that, because the provider's method was not more accurate, the Intermediary's adjustment was appropriate.

The provider is required under 42 CFR 405.406 and 405.453 to maintain sufficient auditable

financial records and statistical data to support costs claimed. In addition, 42 CFR 405.453 requires that the data be adequate to accomplish its intended purpose. Since no regulations specifically address the issue in this case, discrete cost finding, the Board finds that Secs. 2328D and 2313.1 of HIM 15-1 apply. Sec. 2328D requires that income derived from unallowable functions, such as the DP services sales in this case, be used to reduce costs in situations where cost centers are not maintained. Sec. 2313.1, which the Board finds is a reasonable application of 42 CFR 405.453, permits fragmentation of the A&G cost center. However, the Board finds that the provider failed to meet the requirements set forth in Sec. 2313.1D. The DP activity did not qualify as a cost center; there was no recording of the costs on a regular basis throughout the period; the square foot statistical base did not accurately measure the services rendered; and no other auditable statistics were maintained.

The provider argued that the facts in this case are similar to those in *PRRB Dec.* No. 85-D69. The Board finds that the facts in this case are not like those in PRRB Dec. No. 85-D69. In the cited decision, the discrete costing method had prior Intermediary approval and appropriate documentation to support a more accurate determination of costs. The facts in the present case are the reverse. Provider Exhibit B is a post hoc rationalization of the allocation (TR 96-97). It was based on machine utilization estimates and not on square feet. The 35% allocation ratio was based on a consultant's instruction (TR 51). The square footage analysis (Provider Exhibit A) was developed later to support that estimate (TR 52).

*Decision:*

The Intermediary's adjustments are affirmed. The provider's allocation was not more accurate and was not supported by appropriate auditable documentation as required pursuant to 42 CFR 405.406 and 42 CFR 405.453.

*Copyright © 2002, **CCH** INCORPORATED. All rights reserved.*