# P-12

# PRRB-DEC, MED-GUIDE 1987-1 MED-GUIDE-TB ¶36,088, South Shore Hospital, Inc. (South Weymouth, Mass.) v. Blue Cross and Blue Shield Association/Blue Cross of Massachusetts, Inc., PRRB Hearing , (Nov. 24, 1986)

*Copyright © 2002, CCH INCORPORATED. All rights reserved.*

**South Shore Hospital, Inc. (South Weymouth, Mass.) v. Blue Cross and Blue Shield Association/Blue Cross of Massachusetts, Inc.**

**PRRB Hearing** Dec. No. 87-D22, Nov. 24, 1986, (cost reporting period ending September 30, 1982)

**Medicare: Sick Leave; Community Relations; Insurance Refund**

**Provider reimbursement--Cost related to patient care--Sick leave.--**
A provider's sick leave costs were allowable in the cost reporting period in which they were claimed because the right of the employees to demand cash benefits for unused sick pay vested, even though the employees did not have the right to demand cash benefits for the first 25 days. The provider was not relieved of its obligation to compensate the employees in the future for the initial 25 days accumulated because employees were entitled to payment for all unused sick pay upon retirement of voluntary termination of employment. Because only 0.25% of sick pay rights were forfeited by employees who were terminated for cause, payment of the accrued compensation was probable.

See ¶5999S-1.75.

**Provider reimbursement--Cost data and cost finding--Adequacy of cost information--Inadequate records as basis for disallowance.--**
A provider that reclassified one-twelfth of its community relations costs to its nonreimbursable fund-raising cost center was properly disallowed the remaining expense in the community relations department cost center. Although community relations costs are allowable, the intermediary properly reclassified all of the provider's community relations costs to the nonreimbursable cost center, because the provider did not meet recordkeeping requirements and did not furnish documentary evidence to substantiate its allegations as to the percentage of community relations costs as opposed to the costs of fund-raising activities performed by the community relations department. The provider's statement that fund-raising activities were confined to two months of the year was not supported by the evidence.

See ¶6420.

**Provider reimbursement--Discounts, allowances, and refunds--Accounting treatment--Cost reporting forms.--**
A provider that received a refund from a private insurance plan was not required to offset the amount of the refund against allowable administrative expenses in its cost report. The refund was a financial incentive for the provider to notify the plan of cases in which other insurance carriers, excluding Medicare, were primarily liable for payment. A portion of the savings to the plan was passed along to the provider, but the intermediary did not show any connection between the costs, if any, and the amount of the payments. The payments were incidental to the functions that the billing and accounting personnel would have been performing in the normal course of fulfilling their

responsibilities.

See ¶5561.25, ¶6670.

*Issues:*

1. Were the Intermediary's adjustments of the accrued sick leave costs claimed by the provider proper?

2. Were the provider's community relations costs correctly reclassified by the Intermediary into the nonreimbursable fundraising cost center?

3. Did the Intermediary properly offset revenue received by the provider from the Blue Cross of Massachusetts, Inc., under the Coordination of Benefits program?

*Summary of Facts:*

The provider is a 280-bed, general, short-term, acute care hospital. It filed its cost report for the period ended September 30, 1982, claiming the costs in dispute as allowable. The Intermediary issued a Notice of Program Reimbursement (NPR) on January 27, 1984 and made adjustments pertaining to the issues stated above. The provider filed a request for hearing with the Provider Reimbursement Review Board (Board) pursuant to 42 CFR 405.1835ff and has met the jurisdictional requirements therein. The aggregate amount of reimbursement in controversy is approximately $192,000.

*Issue 1--Accrued Sick Leave Costs:*

In Audit Adjustment No. 5, the Intermediary offset the provider's sick and vacation accrual expenses on the basis that these amounts were not accrued in accordance with HIM 15-1, Sec. 2140 [¶5998] relating to deferred compensation. (The vacation accrual portion is not being contested.) Subsequently, the Intermediary recomputed the adjustment and, in Audit Adjustment No. 27, allowed $210,170, which represented all amounts of sick pay above 25 days that could be sold back to the provider during FYE 1982, whether exercised or not by the end of the fiscal year. Thus, the controversy concerns only the accrual for the first 25 days of sick leave.

Under the provider's sick pay plan, all full-time employees are entitled to 8 hours of sick leave per month and can accumulate up to 120 days of sick leave. Permanent part-time employees can accrue a pro-rata amount based on hours worked per week. Employees may be compensated for unused sick leave in a variety of ways. First, after accumulating 25 days of sick leave, the employee may elect semi-yearly to receive cash for sick time in excess of 25 days. The employee with up to 5 years of service would be reimbursed 25% of this accrued sick time, the employee with 5 through 14 years of service would be reimbursed 50%, the employee with 15 through 24 years of service would be reimbursed 75%, and the employee with 25 years or more of service would be reimbursed 100 percent.

Second, an employee who has accrued in excess of 25 days of sick leave may convert 2 sick days to personal days per year. Third, each employee terminating voluntarily and in good standing would be reimbursed for any remaining accrued sick time based on length of employment similar to the schedule for sick leave buy-back, e.g., an employee who terminates with up to 5 years of service would receive 25% of accrued sick time as a termination benefit; an employee with 5 through 14 years would receive 50%, etc. Fourth, an employee retiring through the hospital's retirement program would receive 100% of the accrued sick time at time of retirement.

The employer, however, is not required to reimburse the employee if he is not terminated voluntarily and in good standing. The provider reported that the amount forfeited under these conditions was 0.25% for FYE 1982.

During FYE 1982, the provider changed its method of accounting for sick leave from the cash to the accrual basis. The provider accrued $106,084 in sick pay attributable to hours worked during FYE 1982, and $483,136 attributable to hours worked in prior years, for a total of $589,220 in aggregate accrued sick pay liability as of September 30, 1982. The amount of Medicare reimbursement in dispute is approximately $154,000.

*Provider's Contentions:*

The provider contends that the Intermediary's disallowance of the accrual for sick pay is improper and violates the Medicare regulation, 42 CFR 405.453(e), that ". . . cost data submitted must be based on the accrual basis of accounting which is recognized as the most accurate basis for determining costs." Based on this regulatory provision, sick leave costs must be claimed in the year in which the sick leave was earned by the employees and, thus, incurred as an expense by the provider. The provider argues that there is no reason why sick leave costs should be subject to the cash basis method of accounting whereas all other expenses, including other employee fringe benefits, such as vacation or pension pay, are on the accrual basis. The provider maintains that the sick leave costs actually were incurred during FYE 1982, are readily determinable, and represent a legal obligation to make payment in accordance with the sick leave policy. The possibility that some portion of the accrual might not be paid if the employee is terminated for cause should not alter this conclusion, particularly since the 0.25% forfeiture rate is so low as to be immaterial.

The provider acknowledges that there was a minute percentage of forfeitures for the year in dispute, but argues that this does not alter the vested nature of the sick leave benefits earned. The accrued sick leave benefits were neither a contingency that was not vested nor too speculative to accrue accurately at a specific amount. In this case, payment of the accrual is very probable (99.75%) and can be reasonably estimated. In further support of its argument, the provider cites generally accepted accounting principles (GAAP) as expressed in the Financial Accounting Standards Board Statement No. 43 (FASB-43), dealing with accounting for compensated absences, which provides as follows:

An employer shall accrue a liability for employees' compensation for future absences if all of the following conditions are met:

a. The employer's obligation relating to employees' rights to receive compensation for future absences is attributable to employees' services already rendered,

b. The obligation relates to rights that vest or accumulate,

c. Payment of the compensation is probable, and

d. The amount can be reasonably estimated.

The provider contends that, inasmuch as all four requirements set forth in FASB-43 have been satisfied, it was required by the regulations and by GAAP to accrue a liability for the sick leave costs in dispute.

Finally, the provider points out that its position has been accepted by the Board, the Federal courts, and the HCFA Administrator.

*Intermediary's Contentions:*

The Intermediary contends that the sick pay each employee earned for the first 25 days can only be an incurred cost for purposes of 42 CFR 405.451 if the sick pay is either paid or properly accrued under Medicare principles. The accrued amounts for the first 25 days represent the cost of sick leave not yet paid. To be allowable as incurred costs, the claimed costs must meet the definition of a proper accrual under the Medicare principles of reimbursement. Where Medicare principles of accrual deviate from GAAP, the Medicare principles control.

The Intermediary contends that HIM 15-1, Sec. 2144.8A [¶5999S-1], is the Medicare program's interpretation of 42 CFR 405.451 relative to incurring costs for sick leave. Sec. 2144.8A requires that the amounts claimed as an accrual be both vested and funded in order to be allowable.

The Intermediary points out that it is undisputed in this case that the provider did not fund these accruals, so the first requirement was not met. Further, the Intermediary claims the sick pay policy was analogous to a deferred compensation plan and cites HIM 15-1, Sec. 2140.2 [¶5998] which requires funding for such plans. Moreover, the Intermediary points out that the accruals were not vested because the benefits earned for the first 25 days were not subject to the buy-back program.

Payment for those days cannot be demanded by any employee prior to termination or retirement. Absent proper termination or retirement, the employees had no contractual right to the first 25 days of sick leave.

In addition, the Intermediary argues that payment of the sick leave accrual is contingent upon the occurrence of certain events and can be forfeited upon improper termination. Therefore, payment of the first 25 days was not a vested right of the employees. The Intermediary believes that proper accrual depends upon the obligation to pay 100% of the accrual within the next reporting period. It is the Intermediary's opinion that any possibility of a forfeiture in any amount makes the expense claimed contingent, not vested and not subject to accrual.

The Intermediary takes issue with the provider's calculation of the accrual, because it was based on the assumption that the employees would terminate (and be entitled to lesser amounts) rather than retire. Both possibilities are equally likely, the Intermediary believes, but the amount of the accrual would differ substantially depending upon which assumption was used. Therefore, the calculation of the accrual is not a simple matter in this case and is not readily determinable, as required by FASB-43. Moreover, the liability cannot be determined accurately because of possible changes in salary levels between the time the sick leave is earned and the time it is eventually paid. Further, if the provider were to reduce wages or sick pay benefits in the future, the Intermediary argues, the sick pay accrual may never actually be paid. Thus, an estimate of accrued sick leave costs is not in accordance with the Medicare requirement in 42 CFR 405.451 to pay actual costs.

The Intermediary maintains that, under FASB-43, an accrual for sick pay is not required and is not even recommended, but it is allowed or permitted. Therefore, the Intermediary contends, there is no generally accepted accounting principle with respect to sick pay or even a generally accepted accounting recommendation.

*Issue 2--Community Relations/Fundraising Costs:*

On its cost report, the provider reclassified one-twelfth of its community relations costs to the nonreimbursable fundraising cost center. The Intermediary disallowed the remaining expense in the community relations department cost center and reclassified these costs to the nonreimbursable cost center. While the parties agree that community relations costs are allowable, the dispute concerns the identification and segregation of the nonreimbursable fundraising costs which had been recorded with the other costs of the community relations department as maintained on the provider's records. The amount of Medicare reimbursement in dispute is approximately $32,000.

*Provider's Contentions:*

The provider contends that 90% of the work time of the community relations department was devoted to community relations activities. The remaining time was spent on the annual appeal fundraising drive during portions of December and January. The provider indicates that it has not

performed a detailed time study, however, because of the nature of the fundraising activities. Since virtually all of the fundraising activities took place on an intensive basis during the months of December and January and the remainder of the year practically no time was spent on this activity, a time study during a sample period of one or two weeks out of the year probably would not produce accurate results on a yearly basis. The provider believes it is unreasonable for the Intermediary to disallow the entire department expense.

*Intermediary's Contentions:*

The Intermediary contends that sufficient documentation has not been presented by the provider to establish the allocation of allowable community relations costs and nonallowable fundraising costs. The Intermediary claims there was no time study or other reliable and verifiable statistical basis to use in order to separate these costs which were combined in one cost center. The provider used estimates after the fact, rather than contemporaneously identifying and segregating the costs and maintaining separate records during the cost reporting period. In fact, the estimates conflict. The Intermediary states that it had advised the provider on several occasions that a time study would be necessary to support the claims for the community relations costs. The Intermediary asserts that the provider did not question this request, but rather, ignored the instructions year after year.

In support of its disallowance, the Intermediary cites 42 CFR 405.406(a), which requires that providers "maintain sufficient financial records and statistical data for proper determination of costs payable under the program," as well as 42 CFR 405.453(c) and HIM 15-1, Sec. 2304 [¶6420], which require that provider data "be accurate and in sufficient detail to accomplish the purposes for which it is intended."

*Issue 3--Coordination of Benefits Revenue Offset:*

As part of its private agreement, Blue Cross of Massachusetts, Inc., (Plan) offered the provider a financial incentive to notify it of cases where other insurance companies or carriers (excluding Medicare) were primarily liable for payment. The Plan would pass along a portion of its savings to the provider. During the year, the Plan paid the provider $16,336 for identifying these cases. In Audit Adjustment No. 20, the Intermediary offset the payments made by the Plan to the provider under the Coordination of Benefits (COB) program against allowable administrative and general expenses. The amount of Medicare reimbursement in dispute is approximately $6,000.

*Provider's Contentions:*

The provider contends that the HIM 15-1, sec. 2105.2 [¶5875A] reference cited by the Intermediary in its Audit Adjustment No. 20 was inapposite. This section relates to "cost of meals for other than provider personnel," and does not address administrative and general expenses or otherwise support the offset of the COB revenue.

In addition, the provider contends that the COB program was offered as an incentive by the Plan for the provider to insure that other third-party payers pay their share of the expenses. Offsetting this revenue runs counter to encouraging such activity. Moreover, the provider argues that the program specifically does not apply to Medicare claims so no extra costs can be incurred by Medicare as a result of this program.

*Intermediary's Contentions:*

The Intermediary contends that the COB costs were not related to patient care. The Intermediary argues that the costs of the accounting and billing activities which related to the COB program and for which the provider received a reward did not benefit the Medicare program. In fact, the Intermediary points out, Medicare claims were specifically excluded from the contract. Therefore, the costs may not be reimbursed by Medicare.

According to the Intermediary, it was not appropriate to establish a separate COB cost center because the activity was so intertwined with the other billing and accounting functions. Therefore, the offset of income derived from the activity was the proper treatment. The Intermediary acknowledges that the reference cited in its audit adjustment was incorrect and points out that the reference should have been HIM 15-1, Sec. 2328D [¶6670]. Further, the Intermediary argues that the incentive program was for the benefit of the Plan in its private capacity and had nothing to do with the Medicare program.

*Citation of Applicable Law, Regulations and Program Instructions:*

1. *Law--Title XVIII of the Social Security Act:*

Sec. 1861(v)(1)(A)--Reasonable Costs ... [¶16,974]

2. *Regulations--42 CFR 405, Subpart D:*

a. Sec. 405.402--Reasonable Cost Reimbursement ... [¶18,934]

b. Sec. 405.406--Financial Data and Reports ... [¶6323]

c. Sec. 405.451--Cost Related to Patient Care ... [¶5850]

d. Sec. 405.453--Cost Data and Cost Finding ... [¶6325]

3. *Provider Reimbursement Manual (HIM 15-1):*

a. Sec. 2100--Costs Related to Patient Care ... [¶5854]

b. Sec. 2102.1--Reasonable Costs ... [¶5858]

c. Sec. 2140.--Deferred Compensation ... [¶5998]

d. Sec. 2144--Fringe Benefits ... [¶5999M]

e. Sec. 2146--Vacation Costs ... [¶5999-T1]

f. Sec. 2300--Accrual Basis of Accounting ... [¶6329]

g. Sec. 2304--Adequacy of Cost Information ... [¶6420]

h. Sec. 2305--Liquidation of Liabilities ... [¶6424]

i. Sec. 2328D--Costs of Nonreimbursable Areas ... [¶6670]

*Conclusions and Findings:*

The Provider Reimbursement Review Board (Board), after consideration of the facts, parties' contentions and evidence presented, concludes and finds as follows:

*Issue 1--Accrued Sick Leave Costs:*

The Intermediary's adjustments are reversed. The Board finds that the provider's accrued sick leave costs are allowable in the cost reporting period in which they were claimed. The regulations at 42 CFR 405.453(b)(2) require that cost reports be filed (and costs claimed) on the accrual basis of accounting. The accrual basis of accounting, as it relates to the reporting of sick leave costs, is set forth in FASB-43 as GAAP. Therefore, in deciding the issue, the Board must compare the provisions of FASB-43 with the facts in this case. The provisions of FASB-43 are:

a. The employer's obligation relating to employees' rights to receive compensation for future absences is attributable to employees' services already rendered,

b. The obligation relates to rights that vest or accumulate,

c. Payment of the compensation is probable, and

d. The amount can be reasonably estimated.

First, the Board finds that the sick pay benefits were earned by the provider's employees as they performed the services (i.e., services already rendered). Furthermore, the rights to receive sick leave compensation were earned in the same manner as the employees earned rights to receive vacation pay (annual leave) benefits which are accruable as allowable costs under HIM 15-1, Sec. 2146.2 [¶5999-T1]. Nevertheless, HIM 15-1, Sec. 2144.8 implies that sick leave costs earned on the same basis as annual leave costs may not be accrued and claimed until actually paid.

Because the Board believes that the appropriate treatment for costs of both sick leave and vacation pay fringe benefits under 42 CFR 405.453(e) is to accrue and to report (claim) the costs as the benefits are earned, the Board finds that there is a basic inconsistency between these two *Provider Reimbursement Manual* provisions, Secs. 2144.8 and 2146.2 and that the treatment under Sec. 2146.2 must prevail because it is the only one which is consistent with the regulations.

Second, the facts in this case indicate that the employees' rights did vest and accumulate. Even though the employees did not have the right to demand cash benefits for the first 25 days, the provider nevertheless was not relieved of its obligation to compensate the employees in the future for these days.

Third, based on the evidence in the record, only 0.25% of sick pay rights were forfeited by employees who were terminated for cause, so payment of the compensation is probable.

Fourth, the provider made reasonable and reliable calculations of the amounts accrued based on the employees' current earnings, which is the most conservative amount the employer might be obligated to pay. Almost without exception, the amount of sick leave to be paid at times in the future will exceed the amount estimated based on an employee's current earnings because salary increases were not anticipated in the amount used for the accrual.

According to 42 CFR 405.1867, the Board must afford great weight to interpretative rules and general statements of policy, in addition to complying with the provisions of the law and the

regulations. However, in this case, the Board finds the manual provision in Sec. 2144.8, which requires that sick leave payments be claimed on the same basis as deferred compensation, to be inappropriate. The Board concludes that sick leave costs should be accrued and claimed in the same manner as vacation pay costs.

Moreover, even if the Board were to view this issue within the context of HIM 15-1, Sec. 2305 [¶6424], concerning the liquidation of a liability within 1 year after the end of the cost reporting period in which the liability is incurred, that section specifically does not apply to vacation costs. The Board finds that sick leave and vacation are virtually identical in terms of the employee benefits they represent, and therefore the Board can find no reason to require liquidation of the liability for sick leave payments.

Finally, 42 CFR 405.453 requires that cost data, as the basis of reimbursable costs, must be based ". . . on the accrual basis of accounting." The term "accrual basis of accounting" is defined in 42 CFR 405.453(b)(2) as follows:

> Under the accrual basis of accounting, revenue is *reported* in the period when it is earned, regardless of when it is collected, and expenses are *reported* in the period in which they are incurred, regardless of when they are paid. (emphasis added)

The Board concludes that there is only one interpretation to the term "reported" as used in 42 CFR 405.453(b)(2) and that is its use in connection with the cost report. The provider must report the cost data on the cost report, as set forth in 42 CFR 405.453. Thus, the Board concludes that the provider is entitled to claim the accrued sick leave costs as allowable costs in the cost reporting period in dispute.

*Issue 2--Community Relations/Fundraising Costs:*

The Intermediary's adjustment is affirmed. The Board finds that the provider did not meet the recordkeeping requirements of 42 CFR 405.406, 405.453 and HIM 15-1, Sec. 2304 [¶6420]. The provider has not furnished documentary evidence to substantiate its allegations as to the percentage of community relations costs which should be reclassified into the nonreimbursable fundraising cost center. Although it is unlikely that 100% of the community relations department costs relate to fundraising activities, the Board finds no evidence in the record that the fundraising activities were limited to the times claimed, were concluded as planned, or were confined solely to two months of the year. Conflicting statements from the provider appear in the record indicating that fundraising activities comprise one-twelfth (8.3%) as shown in Intermediary Exhibits 13 and 15, and 10% as reflected in Intermediary Exhibit 16. Therefore, absent documentation, the Board finds that the Intermediary's adjustment must be upheld.

*Issue 3--Coordination of Benefits Revenue Offset:*

The Intermediary's adjustment is reversed. The Board finds that the revenue offset was not proper. Aside from the fact that the Plan was making these payments, the Intermediary has not shown any connection between the costs (if, in fact, any costs were involved) and the amount of the payments from the Plan. The Board finds that the payments were incidental to the functions which the billing and accounting personnel would have been performing in the normal course of fulfilling their responsibilities.

*Decision:*

*Issue 1--Accrued Sick Leave Costs:*

The Intermediary's adjustments are reversed. The accrued sick leave costs claimed by the provider are allowable.

*Issue 2--Community Relations/Fundraising Costs:*

The Intermediary's adjustment is affirmed. The provider's community relations costs were correctly reclassified by the Intermediary into the nonreimbursable fundraising cost center.

*Issue 3--Coordination of Benefits Revenue Offset:*

The Intermediary's adjustment is reversed. The revenue received by the provider from Blue Cross of Massachusetts, Inc., under the Coordination of Benefits program should not be offset.

*Copyright © 2002, CCH INCORPORATED. All rights reserved.*

# P-13

# CMS-DEC, MED-GUIDE 1987-2 MED-GUIDE-TB ¶36,236, South Shore Hospital, Inc. v. Blue Cross and Blue Shield Association/Blue Cross of Massachusetts, Inc., HCFA Administrator Decision , (Jan. 23, 1987)

*Copyright © 2002, CCH INCORPORATED. All rights reserved.*

**South Shore Hospital, Inc. v. Blue Cross and Blue Shield Association/Blue Cross of Massachusetts, Inc.**

**HCFA Administrator Decision** Jan. 23, 1987

**Medicare: Insurance Refund**

**Provider reimbursement--Discounts, allowances, and refunds--Accounting treatment--Cost reporting forms.--**
Under a coordination of benefits program, a private health insurer paid the provider a financial incentive to notify it of cases in which other insurance companies--other than Medicare--were primarily liable for payment. The Board, finding that no costs had been incurred under the Medicare program, did not require a revenue offset. But some of the time of the provider's staff members, and the indirect costs associated therewith, must be attributed to the COB program. *Manual* Sec. 2328D provides that when nonreimbursable activities such as gift, flower, and coffee shops are involved, but establishing a new cost center would not be appropriate, the income derived from them must be used to reduce total hospital costs. This treatment gives a reasonably accurate determination of the costs to be excluded for the provider's COB program. Therefore, the revenue received by the provider under the COB program must be offset against the provider's allowable costs pursuant to the method described in *Manual* Sec. 2328D.

See ¶6670.75.

**PRRB Dec. No. 87-D22 (1987-1 Transfer Binder ¶36,088) is affirmed without opinion as to Issue Nos. 1 and 2 (accrued sick leave and community relations costs) and reversed as to Issue No. 3 (revenue offset).**

**[Text of Decision]**

This case is before the Administrator, Health Care Financing Administration, for review of the decision of the Provider Reimbursement Review Board. The review is during the 60-day period in Sec. 1878(f)(1) of the Social Security Act, as amended [42 USC 1395*oo*(f)]. The parties were notified that this case would be before the Administrator for "own motion" review of the Board's decision on Issue No. 3 and of their right to submit comments during the course of this review. The Intermediary commented, requesting that the Board's decision be reversed on Issue No. 3. No comments were received from the provider, and the time for doing so has passed. Accordingly, this case is now before the Administrator for final administrative decision.

*Issue No. 3 and the Board's Decision*

Issue No. 3 is whether revenue received by the provider under a Coordination of Benefits (COB) program should be offset against allowable administrative and general expenses. Under this program, Blue Cross of Massachusetts, Inc. (Blue Cross), acting as a private health insurer, paid to the provider a financial incentive to notify it of cases where other insurance companies (excluding Medicare) were primarily liable for payment. The Board held, after a hearing on the record without oral testimony, that such revenue should not be offset. The Board did not find that any costs had been incurred under the program.

*Summary of the Intermediary's Comments*

The Intermediary requested reversal of the Board's decision on Issue No. 3. The Intermediary wrote that the Board used an improper standard of review when it apparently shifted the burden of proof to the Intermediary. In any event, the Intermediary continued, the facts in the record did establish that the provider incurred costs for the COB program. As this program incurred costs and was not related to patient care, the Intermediary was required by Sec. 2328D [¶6670] of the *Provider Reimbursement Manual* (HIM-15) either to eliminate the costs or to offset the revenue. An offset in this situation would be consistent with the offset approved by the Board in the case of *Charleston Area Medical Center, PRRB Dec.* No. 85-D88 (7/31/85).

The Intermediary also requested the Administrator to reverse the Board's decision on Issue No. 1.

*Law, Regulations, and Other Governing Criteria*

Section 1861(v)(1)(A) of the Social Security Act, as amended, [42 USC 1395x] ... [¶16,974]

42 CFR 405.451 ... [¶5850]

42 CFR 405.1875 ... [¶20,775]

Sec. 2328D of the *Provider Reimbursement Manual* (HIM-15) ... [¶6670]

*Discussion and Evaluation*

All the evidence which was furnished by the Provider Reimbursement Review Board has been considered, including the parties' position papers and exhibits. All communications sent to and received from the parties after entry of the Board's decision have been made a part of the record. The complete statement of facts set forth by the Board in its decision is incorporated by reference.

*Issues No. 1 and No. 2*

Pursuant to the discretion vested in him by 42 CFR 405.1875(d)(2), the Administrator has decided to decline to review these issues; however, to avoid fragmenting the case, he will summarily affirm the Board's decision.

*Issue No. 3.*

During the cost year at issue, the Medicare program reimbursed providers for the reasonable cost of the services rendered to Medicare beneficiaries. The reasonable cost of services, as defined in Sec. 1861(v)(1)(A) of the Social Security Act, is "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services. . . ."

The regulations give further explanation about reimbursable cost. 42 CFR 405.451(c)(3) reads as follows:

> Reasonable cost includes all necessary and proper expenses incurred in rendering services such as administrative costs, maintenance costs, and premium payments for employee health and pension plans. It includes both direct and indirect costs and normal standby costs.

These sentences are immediately followed by:

> However, where the provider's operating costs include amounts not related to patient care, specifically not reimbursable under the program, or flowing from the provisions of luxury items or services . . . such amounts will not be allowable.

These foregoing authorities support the reimbursement principle that for a cost to be reimbursable, the cost must be generated in an activity related to the care of Medicare patients. The costs incurred by the provider's accounting and billing activities are generally allowable costs for Medicare reimbursement purposes, and the program shares proportionately in those costs.

In this case, the provider's accounting and billing activities, which were related to the recovery of insurance payments by Blue Cross, were in no way connected with the Medicare program. In fact, the contract with Blue Cross specifically excluded Medicare claims from the incentive program. Therefore, the costs related to this activity may not be reimbursed under the Medicare program.

Generally speaking, where nonreimbursable activities are involved, the Medicare program requires that a nonreimbursable cost center be established to accumulate those costs and subsequently receive an allocable share of general service costs. This requirement is delineated in Sec. 2328D of the *Provider Reimbursement Manual* (HIM-15).

The *Manual* section also provides that where a cost center would not be appropriate for such activities, "the income derived from them must be used to reduce total hospital costs." Because the provider's activity related to the coordination of benefits program was so intertwined with the provider's normal billing and accounting functions, a separate cost center would not be appropriate for the nonallowable activity. Therefore, the Intermediary's offset of the income derived from the activity was the appropriate treatment. This offset is not an offset against Medicare reimbursement; it is an offset against allowable cost. Therefore, only about $6,000 of reimbursement will be affected.

The Administrator notes that during the cost year at issue, the provider received over $16,300 under the COB program. According to the contract, the maximum payment was 10% of any recovery to Blue Cross up to $500 per claim. For the provider's staff members to have performed under this program to the extent necessary to earn the provider $16,300, some of their time, and the indirect costs associated therewith, must be attributed to the COB program. If the income in this issue were not offset, the program would end up paying a disproportionate share of the provider's costs, contrary to the prohibition on cross-subsidization of costs in Sec. 1861(v)(1)(A) of the Social Security Act, as amended [42 USC 1395x], and 42 CFR 40.451.

The *Provider Reimbursement Manual* is a guideline to aid in the interpretation of the regulations. The Administrator notes that Sec. 2328D, upon which he relies, deals specifically with "gift, flowers, and coffee shops." Sec. 2328D, being explanatory of 42 CFR 405.451, provides a reasonable treatment of the costs of other miscellaneous revenue-producing activities not related to patient care. Accordingly, the Administrator finds that this treatment gives a reasonably accurate determination of the costs to be excluded for the provider's COB program activities.

*Findings of Facts*

1. The provider is a 280-bed, nonprofit, acute care hospital, located in South Weymouth, Massachusetts.

2. The amount of Medicare reimbursement in dispute for the provider's cost reporting period ending 9/30/82 exceeded $10,000.

3. During the cost year at issue, the provider's Medicare utilization rate was 37%.

*Issue No. 3*

4. The provider participated in a Coordination of Benefits (COB) program under a contract with Blue Cross of Massachusetts, Inc.

5. During the cost year at issue, the provider received payment under the COB program of $16,336.

6. The provider's accounting and billing staff carried out the provider's functions under the COB program.

*Conclusions of Law*

*Issue No. 3*

1. The cost of the provider's billing and accounting activities under the COB program was not a cost related to patient care under 42 CFR 405.451.

2. The revenue received by the provider under the COB program must be offset against the provider's allowable cost pursuant to the method described in Sec. 2328D of the *Provider Reimbursement Manual* (HIM-15), which is explanatory of 42 CFR 405.451.

*Decision*

The Board's decision on Issue No. 1 is affirmed. The accrued sick leave costs claimed by the provider are allowable.

The Board's decision on Issue No. 2 is affirmed. The provider's community relations costs were correctly reclassified into the nonreimbursable fundraising cost center.

The Board's decision on Issue No. 3 is reversed. The revenue received by the provider under the Coordination of Benefits program must be offset against allowable cost.

This constitutes the final administrative decision of the Secretary of Health and Human Services.

*Copyright © 2002, CCH INCORPORATED. All rights reserved.*

# P-14

Case 1:06-cv-00260-ML-LDA Document 19-6 Filed 03/09/2007 Page 20 of 39

# PRRB-DEC, MED-GUIDE 1984-2 MED-GUIDE-TB ¶34,095, PRRB DECISION--DISCRETE COST FINDING--MEALS-ON-WHEELS PROGRAM COSTS--COST OF PHYSICIANS' TELEPHONES, *PRRB Hearing Dec.* , (Apr. 12, 1984)

*Copyright © 2002, CCH INCORPORATED. All rights reserved.*

## PRRB DECISION--DISCRETE COST FINDING--MEALS-ON-WHEELS PROGRAM COSTS--COST OF PHYSICIANS' TELEPHONES

***PRRB Hearing Dec.*** , April 12, 1984 No. 84-D108,, (cost reporting periods ending September 30, 1980 and 1981). South County Hospital (Wakefield, Rhode Island) v. Blue Cross and Blue Shield Assoc./Blue Cross of Rhode Island.

**Provider reimbursement--Cost data and cost finding--Discrete cost finding--Inadequate data.--**
A provider was permitted to use discrete cost finding, directly allocating the costs of individual services, as an alternative to the step-down method of cost finding only for costs which have been accurately recorded and are capable of verification. The provider had directly allocated to a separate cost center all costs--including depreciation, operation of plant, and housekeeping--connected with a freestanding facility that was partially used by the hospital and partially rented out. The Board enumerated those costs--building and equipment depreciation, interest expense, property insurance, housekeeping, and utilities--that it found to be specifically identifiable and attributable to the freestanding facility; however, costs that could not be accurately segregated were required to be reported using the step-down method.

Back reference: ¶6671.20.

**Provider reimbursement--Cost data and cost finding--Meals-on-Wheels cost allocation.--**
The direct costs of the Meals-on-Wheels program--food preparation, some salaries, and direct supplies--could be allocated to a separate nonallowable cost center using the discrete costing method of cost finding. The remaining costs of the program, such as supervisors' and dietitians' salaries and the indirect costs of the dietary cost center, had to be apportioned to the Meals-on-Wheels cost center on the basis of a ratio of the number of these meals served to the total number of meals served.

Back reference: ¶5866.50, ¶6480.53, ¶6671.20.

**Provider reimbursement--Cost data and cost finding--Cost of telephones in physicians' offices.--**
A provider was not allowed to use a revenue offset of direct, discrete costs in determining the amount to be allocated to extensions of hospital telephones located in physicians' offices. The Board directed that all such costs should be set up in a nonallowable cost center, with indirect costs allocated in the same manner as patient bedside telephones, following the procedure outlined in *Provider Reimbursement Manual* Sec. 2328 (Rev. 302) [¶6670].

Back reference: ¶6670.75.
*Issues:*

1. Whether the Intermediary's adjustments, which disallowed discrete costing for the costs incurred

in a separate and distinct part of the hospital, are correct?

2. Whether the Intermediary's methodology used to arrive at the cost of Mealson-Wheels is proper?

3. Whether the Intermediary's adjustment to the cost of physician telephones is in accordance with the Medicare program?

*Summary of Facts:*

The provider is a general short-term, acute-care hospital. On June 30, 1982, and September 30, 1982, the Intermediary furnished the provider its Notices of Program Reimbursement for the fiscal years ending September 30, 1980, and 1981.

The provider, disputing the aforesaid issues, which involve Medicare reimbursement of approximately $31,000 for Issue 1 (discrete costing), $19,000 for Issue 2 (Meals-on-Wheels), and $5,500 for Issue 3 (physician telephones), filed timely requests for hearing before the Provider Reimbursement Review Board (Board) pursuant to 42 CFR 405.1835ff and has met the jurisdictional requirements therein.

*Issue 1--Discrete Costing (Bacon House):*

The provider established a general ledger account and cost center labeled "Maintenance of Personnel." This cost center represents the costs of an old free-standing building (Bacon House), which is partly used by the hospital and partly rented.

The Intermediary's adjustments eliminated Bacon House as a separate cost center by reclassifying the direct costs of gas, water, electricity, and housekeeping services to the operation of plant and housekeeping departments. Bacon House depreciation was reclassified back to the hospital depreciation cost center. In addition, the square footage in Bacon House was added to the total hospital square footage statistics to distribute depreciation and interest, operation of plant, and repairs and maintenance. The Intermediary also adjusted the statistics used to distribute housekeeping costs to Bacon House.

*Provider:*

The provider asserts that it has the capability to discrete cost a separate and distinct part of its facility. The provider maintained a separate cost center for this facility and has auditable and verifiable data in order to accurately use discrete costing. The provider has accurately allocated the cost of interest, depreciation, property insurance, and costs related to the operation of plant, and has used appropriate statistics to allocate overhead cost.

The provider contends that cost reimbursement requires that the hospital receive payments for costs incurred in providing services to Medicare beneficiaries. The law requires no less. Similarly, Medicare regulations require that providers be reimbursed their costs, with exceptions not relevant here. (42 CFR Secs. 405.401, 405.402, and 405.460.)

To the extent that excessive costs are allocated to nonallowable cost centers in Bacon House, the hospital is not reimbursement for the costs of rendering care to Medicare beneficiaries. The result is that other payors are required to pay more than their share of such costs, in clear violation of provisions of the Medicare law and regulations prohibiting cross-subsidization between Medicare and other payors. (42 CFR Section 1861(v)(1)(A); 42 CFR Section 405.402.)

*Intermediary:*

The Intermediary has taken the position that the provider has not complied with Medicare regulations related to direct/discrete costing. Based on the Intermediary's interpretation of the regulations, it reclassified all direct costs to the overhead cost centers, i.e., depreciation, operation of plant, and housekeeping. The Intermediary then established a cost center for "Physicians' Private Offices," with appropriate statistics, for cost finding. In addition, that portion of the "Maintenance of Personnel" (Bacon House) attributable to the fund raising and the medical records cost centers was reclassified in the cost report to the appropriate lines for both direct cost and statistical cost for allocation purposes.

The Intermediary's adjustments were based on the *Provider Reimbursement Manual* (HIM 15), Secs. 2302.7 [¶6360], 2302.8 [¶6365], Part I, and Secs. 308 [¶9308] and 328 [¶9328], Part II.

*Issue 2--Meals-on-Wheels:*

The provider determined the labor cost of the Meals-on-Wheels program by performing quarterly two-week time studies. The costs of raw and precooked food and supplies were determined by pricing the specific raw food components using vendor invoices. The provider submitted documentation to support discrete costing of the direct costs of the Meals-on-Wheels program, i.e., labor, raw food, supplies and a supervisor. The provider filed the cost report with Meals-on-Wheels as a separate cost center that received overhead in the usual step-down cost finding. The direct and indirect costs show a cost of $1.94 per meal for the 1980 cost reporting period.

The Intermediary eliminated the provider's separate Meals-on-Wheels cost center and reclassified the direct costs to the dietary cost center. The Intermediary determined the costs of the program by using a formula, and offset those costs in an A-8 worksheet adjustment.

*Provider:*

The provider contends that the Intermediary has attributed excessive costs to the Meals-on-Wheels program. The provider notes that Meals-on-Wheels is essentially an overlay on top of existing

provider activities and that it has separated the costs of labor, raw food, supplies, and supervision about as well as circumstances permit, and certainly with far more precision than is reflected in the Intermediary's formulas. The provider questions whether the Intermediary's method may be used under any circumstances and submits that in no event should it be imposed on a provider that can document Meals-on-Wheels costs.

Alternatively, the provider submits that if its method cannot be accepted, it cannot determine the cost of Meals-on-Wheels at all. If this is correct, the cost should be accounted for by a revenue offset under the terms of Sec. 2328 [¶6670] of HIM-15, Part I.

*Intermediary:*

The Intermediary asserts that the provider attempted to direct cost certain elements of the Meals-on-Wheels program costs based on four two-week time studies conducted during each quarter of its fiscal year. The records presented by the provider in support of its partial direct costing proved to be inadequate. Time studies were not signed. In many cases these time studies indicated no relationship between the number of meals and the time involved in their preparation. The documents did not indicate actual quantities or unit costs of food supplies used. Since the provider's records were inadequate, the Intermediary used a standard formula to arrive at the cost of Meals-on-Wheels to be eliminated from reimbursable costs.

*Issue No. 3--Physician Telephone Cost:*

The provider filed the cost report showing a revenue offset of $4,718 for telephones for fourteen physicians. The telephones at issue were extensions of the main hospital telephone exchange and were located in the physicians' offices.

The Intermediary disallowed the revenue offset and required that the cost of the fourteen telephones be allocated to a nonallowable cost center.

*Provider:*

The provider asserts that the Intermediary's adjustment is inappropriate since any cost related to the use of these phones in excess of the direct, discrete costs billed to the physicians is related to hospital care.

The provider contends that the physicians using the fourteen extensions admit 67.7% of the total hospital patients. Having these phones available to hospital personnel as if they were hospital extensions increased the efficiency of the hospital, since admitting personnel were able to immediately access the physician's office to obtain admitting information. Operating room personnel also were able to schedule surgical cases in the same manner. Nursing floors were able to obtain physician orders and transfer test results. The same was true for the laboratory, X-ray, emergency room, and other departments, bypassing the services of the switchboard operators and needlessly

tying up trunk lines.

All of the physicians' offices have at least one private telephone to receive calls from patients. [Since] published telephone listings of these physicians are for their private telephones, calls from their private patients (and other outside callers) would be to the private telephones. Since these telephones were often busy, the hospital needed its own telephone system to quickly access the offices. Since 73.3% of all hospital surgery was performed by these doctors, an immediate and direct access to them was important if the condition of a hospital patient deteriorated subsequent to surgery.

Accordingly, it is the hospital's position that these physicians' phones were required to conduct hospital business and assist hospital personnel in conducting their business.

The provider also contends that the Intermediary has allocated excessive costs to these physician phones. Physicians' offices are open only eight hours per day, while the hospital switchboard is open 24 hours per day. In addition, physicians do not incur costs for long distance calls, since they use their own separate and private telephones for such use.

In summary, the large volume of hospital business conducted by these physicians warranted the hospital incurring the expense of these telephones to deliver patient care. The provider's treatment of physician telephone expense in the cost report as filed represents the most accurate allocation of costs of those telephones that benefit the entire institution. Furthermore, the Intermediary has allocated an excessive amount of cost to these telephones when specific, discrete and more accurate cost data is available.

*Intermediary:*

It is the Intermediary's position that the costs of the telephones in question are related to physicians' private patients and/or business, are not related to provider patient care and, therefore, are not reimbursable by Medicare. References used to support their position are HIM-15, Part I, Secs. 2102.3 [¶5866], 2106.1 [¶5876], 2302.7, and 2313.1 [¶6475A], and HIM-15, Part II, Sec. 328 [¶9328].

*Citations of Applicable Law, Regulations, and Program Instruction:*

1. *Law--Title XVIII of the Social Security Act:*

Sec. 1861(v)(1)(A)--Reasonable Cost

2. *Regulations--42 CFR 405, Subpart D:*

a. Sec. 405.401--Cost Reimbursement--Introduction ... [¶18,933]

b. Sec. 405.402--Cost Reimbursement--General ... [¶18,934]

c. Sec. 405.451--Cost Related to Patient Care ... [¶5850]

d. Sec. 405.460--Limitation on Coverage of Costs ... [¶7515]

3. *Program Instructions--Provider Reimbursement Manual (HIM 15--Part I and Part II):*

a. Sec. 308--Reclassification Affecting A & G ... [¶9308]

b. Sec. 328--Worksheet B--Cost Allocation ... [¶9328]

c. Sec. 2102.3--Cost Not Related to Patient Care ... [¶5866]

d. Sec. 2106.1--Cost of Telephone, Television & Radio ... [¶5876]

e. Sec. 2302.6--Definition--Charges ... [¶6355]

f. Sec. 2302.7--Cost Finding ... [¶6360]

g. Sec. 2302.8--Cost Center ... [¶6365]

h. Sec. 2302.10--Special Service Cost Center ... [¶6375]

i. Sec. 2313.1--Changing Bases for Allocating Centers or Order in which Cost Centers are Allocated ... [¶6475A]

j. Sec. 2328--Distribution of General Service Cost to Nonallowable Cost Areas ... [¶6670]

*Conclusions and Findings:*

The Provider Reimbursement Review Board (Board), after consideration of the facts, parties' contentions, and evidence presented, concludes and finds as follows:

*Issue 1--Discrete Costing (Bacon House):*

The Intermediary's adjustments are modified. The Board finds that the provider may discretely allocate costs which are specifically identifiable and attributable to Bacon House. These costs are:

1. Building Depreciation;

2. Interest Expense;

3. Equipment Depreciation (all equipment in Bacon House);

4. Property Insurance;

5. Gas and Water;

6. Electricity--based on the actual usage for the periods before and after and including the years under appeal;

7. Housekeeping (per contract).

There is no evidence that the provider maintained auditable cost records that accurately segregate the other cost items between the hospital and Bacon House. Therefore, for all the remaining costs, the provider must use the step-down cost finding method required in the cost reporting forms in accordance with Reg. Sec. 405.453 and HIM 15, Part II, Sec. 328.

*Issue 2--Meals-on-Wheels:*

The Intermediary's adjustments are modified. The Board finds that the provider has provided adequate documentation to support discrete costing of most of the direct costs of the Meals-on-Wheels program, i.e., food preparation, salaries, and direct supplies. However, other elements of direct costs, which are salaries of supervisors and dietitians, as well as the fringe benefits attributable to the direct salaries, must be allocated to the Meals-on-Wheels cost center. The direct costs of supervisors' and dietitians' salaries, and the indirect costs of the dietary cost center, should both be apportioned to the Meals-on-Wheels cost center, based on the ratio of the number of these meals served to the total of meals served.

*Issue 3--Physician Telephone Cost:*

The Intermediary's adjustment is modified. The Board finds that the costs of the telephone extensions located in the physicians' offices should be set up in a nonallowable cost center. Indirect costs should be allocated to the cost center in the same manner as patient bedside telephones. The procedure set forth in HIM 15, Sec. 2328 (Rev. 302) should be followed.

*Decision:*

*Issue 1--Discrete Costing (Bacon House):*

The Intermediary's adjustments are modified. The provider may discrete cost the specific items enumerated. The remaining costs must be allocated as required by Reg. Sec. 405.453 and HIM 15, Part II, Sec. 328.

*Issue 2--Meals-on-Wheels:*

The Intermediary's adjustments is modified. The direct costs of the Meals-on-Wheels program may be discrete costed. The indirect costs of the dietary cost center should be apportioned to the Meals-on-Wheels cost center based on a ratio of meals served.

*Issue 3--Physician Telephone Cost:*

The Intermediary's adjustment is modified. The costs of the physician telephones should be set up in a nonallowable cost center. The procedure set forth in HIM 15, Sec. 2328 (Rev. 302) should be followed.

*Copyright © 2002, **CCH** INCORPORATED. All rights reserved.*

# P-15

Rhode Island Hospital
Impact of Reimbursed Payroll Adj.
FY 1999

Settlement Summary with cost reclassed to Non Reimbursable Line vs. A-8 Adjustment

| Non Reimbursable Cost Center | Settlement | Wkst. A-8 Adjustment | Settlement | Gain / (Loss) |
|---|---|---|---|---|
| Part A | 1,967,792 | Part A | 1,971,594 | 3,802 |
| Psych | 252,305 | Psych | 258,816 | 6,511 |
| Part B | 415,277 | Part B | 446,989 | 31,712 |
| | | | Total | 42,025 |

Note: Schedule A represents costs in Non Reimbursable CC

Note: Schedule B represents costs as A-8 adjustment

Ernst & Young - microKOSTPAK SYSTEM VERSION 96 PROVIDER NO. : 41-0007 RUN DATE: 06-27-2002
RHODE ISLAND HOSPITAL FROM-TO : 10/01/1998 - 09/30/1999
VERSION 96.40

HOSPITAL AND HOSPITAL HEALTH CARE COMPLEX COST REPORT CERTIFICATION AND SETTLEMENT SUMMARY
SUBMITTED IN LIEU OF HCFA-2552-96
WORKSHEET S, PART II

| PART II - SETTLEMENT SUMMARY | | Title V | ------- Title XVIII ------ | | Title XIX |
|---|---|---|---|---|---|
| | | | PART A | PART B | |
| | | 1 | 2 | 3 | 4 |
| 1. | Hospital | 0 | 1967792 | 415277 | 0 |
| 2. | Subprovider | 0 | 252308 | 0 | 0 |
| 3. | Swing bed - SNF | 0 | 0 | 0 | 0 |
| 4. | Swing bed - NF | 0 | --------- | --------- | 0 |
| 100. | TOTAL | 0 | 2220100 | 415277 | 0 |

The above amounts represent "due to" or "due from" the applicable Program for the element of the above complex indicated.

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-0050. The time required to complete this information collection is estimated to average 657 hours per response, including the time to review instructions, search existing resources, gather the data needed, and complete and review the information collection. If you have any comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: Health Care Financing Administration, 7500 Security Boulevard, N2-14-26, Baltimore, Maryland 21244-1850, and to the Office of the Information and Regulatory Affairs, Office of Management and Budget, Washington D.C. 20503.

Schedule A

Ernst & Young - microKOSTFAK VERSION 96 | PROVIDER NO : 41-0007 | RUN DATE: 06-27-2002
RHODE ISLAND HOSPITAL | | FROM-TO : 10/01/1998 - 09/30/1999
VERSION 96.40

RECLASSIFICATIONS
SUBMITTED IN LIEU OF HCFA-2552-96
WORKSHEET A-6

| | EXPLANATION OF RECLASSIFICATION(S) | CODE (1) 1 | INCREASES: COST CENTER 2 | LINE NO. 3 | SALARY 4 | OTHER 5 | Wkst. A-7 Ref. 10 |
|---|---|---|---|---|---|---|---|
| 1. | | A | Operation Of Plant | 8. | 0 | 265275 | 0 |
| 2. | | A | Respiratory Therapy | 49. | 0 | 156 | 0 |
| 3. | Blood Bank Reclass | B | Blood Storing, Processing & Trans. | 47. | 894768 | 4744253 | 0 |
| 4. | Payroll Billed | C | PAYROLL BILLED | 99.07 | 7733683 | 0 | 0 |
| 5. | | C | CO-OPERATIVE CARE - GENERAL | 19. | 29927 | 0 | 0 |
| 6. | | C | Kidney Acquisition | 83. | 360 | 0 | 0 |
| 7. | | C | Operating Room | 37. | 1978 | 0 | 0 |
| 8. | | C | Radiology-Therapeutic | 42. | 4005 | 0 | 0 |
| 9. | Cafeteria | D | Cafeteria | 12. | 1542318 | 1377931 | 0 |
| 10. | Interest Expense | E | Old Cap Rel Costs-Bldg & Fixt | 1. | 0 | 2989761 | 9 |
| 11. | | E | Old Cap Rel Costs-Mvble Equip | 2. | 0 | 1110021 | 9 |
| 12. | | E | New Cap Rel Costs-Bldg & Fixt | 3. | 0 | 4666051 | 9 |
| 13. | | E | New Cap Rel Costs-Mvble Equip | 4. | 0 | 3021130 | 9 |
| 14. | Bond Amortization | F | Old Cap Rel Costs-Bldg & Fixt | 1. | 0 | 40302 | 9 |
| 15. | | F | Old Cap Rel Costs-Mvble Equip | 2. | 0 | 14963 | 9 |
| 16. | | F | New Cap Rel Costs-Bldg & Fixt | 3. | 0 | 28348 | 9 |
| 17. | | F | New Cap Rel Costs-Mvble Equip | 4. | 0 | 24829 | 9 |
| 18. | Physician Reclass Admin | G | I&R Services-Other Prgm Costs Apprvd | 23 | 0 | 3052 | 0 |
| 19. | | G | Research | 97. | 0 | 1083 | 0 |
| 20. | CDC | H | I&R Services-Other Prgm Costs Apprvd | 23. | 0 | 37748 | 0 |
| 21. | | H | OTHER NON-REIMBURSEABLE | 99.11 | 0 | 4735 | 0 |
| 22. | | H | Research | 97. | 0 | 73143 | 0 |
| 23. | Emergency | I | I&R Services-Other Prgm Costs Apprvd | 23. | 0 | 382502 | 0 |
| 24. | | I | OTHER NON-REIMBURSEABLE | 99.11 | 0 | 65033 | 0 |
| 25. | | I | Research | 97. | 0 | 245838 | 0 |
| 26. | Neurology | J | I&R Services-Other Prgm Costs Apprvd | 23. | 0 | 199050 | 0 |
| 27. | | J | OTHER NON-REIMBURSEABLE | 99.11 | 0 | 7038 | 0 |
| 28. | | J | Research | 97. | 0 | 151259 | 0 |
| 29. | Pathology | K | I&R Services-Other Prgm Costs Apprvd | 23. | 0 | 179888 | 0 |
| 29.01 | | K | OTHER NON-REIMBURSEABLE | 99.11 | 0 | 7488 | 0 |
| 29.02 | | K | Research | 97. | 0 | 156617 | 0 |
| 29.03 | Anesthesia | L | I&R Services-Other Prgm Costs Apprvd | 23. | 0 | 18667 | 0 |
| 29.04 | Radiology | M | I&R Services-Salary & Fringes Apprvd | 22. | 0 | 51041 | 0 |
| 29.05 | | M | OTHER NON-REIMBURSEABLE | 99.11 | 0 | 7576 | 0 |
| 29.06 | | M | Research | 97. | 0 | 9237 | 0 |
| 29.07 | Radiology Ther | N | I&R Services-Other Prgm Costs Apprvd | 23. | 0 | 55741 | 0 |
| 29.08 | | N | OTHER NON-REIMBURSEABLE | 99.11 | 0 | 6316 | 0 |
| 29.09 | | N | Research | 97. | 0 | 27068 | 0 |
| 29.10 | Phys Pri Office | O | Physicians' Private Offices | 98. | 0 | 10000 | 0 |
| 29.11 | Neurology | P | Electroencephalography | 54. | 0 | 12816 | 0 |
| 36. | TOTAL RECLASSIFICATIONS (sum of columns 4 and 5 must equal sum of columns 8 and 9) | ---- | ---------- | ---------- | 10207039 | 20006056 | |

(1) A letter (A,B,etc.) must be entered on each line to identify each reclassification entry. Transfer the amounts in column 4,5,8, and 9 to Worksheet A, column 4, lines as appropriate. See instructions for column 10 referencing to Worksheet A-7, Part III, columns 9 through 14.

A

Ernst & Young - microKOSTPAK VERSION 96 PROVIDER NO : 41-0007 RUN DATE: 06-27-2002
RHODE ISLAND HOSPITAL FROM-TO : 10/01/1998 - 09/30/1999
VERSION 96.40

RECLASSIFICATIONS
SUBMITTED IN LIEU OF HCFA-2552-96
WORKSHEET A-6

| | EXPLANATION OF RECLASSIFICATION(S) | CODE (1) 1 | DECREASES COST CENTER 6 | LINE NO. 7 | SALARY 8 | OTHER 9 | Wkst. A-7 Ref. 10 |
|---|---|---|---|---|---|---|---|
| 1. | W & I ADJUSTMENT | A | Old Cap Rel Costs-Bldg & Fixt | 1. | 0 | 265287 | 9 |
| 2. | | A | OTHER ADMINISTRATIVE AND GENERAL | 6.06 | 0 | 144 | 0 |
| 3. | Blood Bank Reclass | B | Laboratory | 44. | 894700 | 4744253 | 0 |
| 4. | Payroll Billed | C | PURCHASING | 6.03 | 6997 | 0 | 0 |
| 5. | | C | OTHER ADMINISTRATIVE AND GENERAL | 6.06 | 16533 | 0 | 0 |
| 6. | | C | Dietary | 11. | 19195 | 0 | 0 |
| 7. | | C | Nursing Administration | 14. | 705180 | 0 | 0 |
| 8. | | C | Pharmacy | 16. | 14939 | 0 | 0 |
| 9. | | C | DEPARTMENT OF MEDICINE | 19.02 | 137171 | 0 | 0 |
| 10. | | C | DEPARTMENT OF SURGERY | 19.03 | 117264 | 0 | 0 |
| 11. | | C | DEPARTMENT OF PEDIATRICS | 19.04 | 1662115 | 0 | 0 |
| 12. | | C | DEPARTMENT OF ORTHOPEDICS | 19.05 | 39097 | 0 | 0 |
| 13. | | C | DEPARTMENT OF PSYCHIATRY | 19.06 | 335526 | 0 | 0 |
| 14. | | C | DEPARTMENT OF CARDIOLOGY | 19.08 | 6553 | 0 | 0 |
| 15 | | C | I&R Services-Salary & Fringes Apprvd | 22. | 1138005 | 0 | 0 |
| 16. | | C | I&R Services-Other Prgm Costs Apprvd | 23. | 2882376 | 0 | 0 |
| 17. | | C | Intensive Care Unit | 26. | 25805 | 0 | 0 |
| 18. | | C | PULMONARY FUNCTION TESTING | 37.02 | 21600 | 0 | 0 |
| 19. | | C | Radiology-Diagnostic | 41. | 2200 | 0 | 0 |
| 20. | | C | Laboratory | 44. | 8808 | 0 | 0 |
| 21. | | C | Physical Therapy | 50. | 156594 | 0 | 0 |
| 22. | | C | Occupational Therapy | 51. | 9547 | 0 | 0 |
| 23. | | C | Speech Pathology | 52. | 794 | 0 | 0 |
| 24. | | C | Electrocardiology | 53. | 1069 | 0 | 0 |
| 25. | | C | Clinic | 60. | 126328 | 0 | 0 |
| 26. | | C | Emergency | 61. | 109874 | 0 | 0 |
| 27. | | C | Research | 97. | 5394 | 0 | 0 |
| 28. | | C | Physicians' Private Offices | 98. | 16335 | 0 | 0 |
| 29. | | C | OTHER NON-REIMBURSEABLE | 99.11 | 32655 | 0 | 0 |
| 29.01 | | C | SNF REHAB | 99.13 | 171991 | 0 | 0 |
| 29.02 | Cafeteria | D | Dietary | 11. | 1542318 | 1377931 | 0 |
| 29.03 | Interest Expense | E | Interest Expense | 88. | 0 | 11786963 | 9 |
| 29.04 | Bond Amortization | F | Other Capital Related Costs | 90. | 0 | 118442 | 9 |
| 29.05 | Physician Reclass Admin | G | OTHER ADMINISTRATIVE AND GENERAL | 6.06 | 0 | 4135 | 0 |
| 29.06 | CDC | H | Clinic | 60. | 0 | 115626 | 0 |
| 29.07 | Emergency | I | Emergency | 61. | 0 | 693373 | 0 |
| 29.08 | Neurology | J | Electroencephalography | 54. | 0 | 357347 | 0 |
| 29.09 | Pathology | K | Laboratory | 44. | 0 | 343993 | 0 |
| 29.10 | Anesthesia | L | Operating Room | 37. | 0 | 18667 | 0 |
| 29.11 | Radiology | M | Radiology-Diagnostic | 41. | 0 | 67954 | 0 |
| 29.12 | Radiology Ther | N | Radiology-Therapeutic | 42. | 0 | 89125 | 0 |
| 29.13 | Phys Pri Office | O | DEPARTMENT OF PSYCHIATRY | 19.06 | 0 | 10000 | 0 |
| 29.14 | Neurology | P | Clinic | 60. | 0 | 12816 | 0 |
| 36 | TOTAL RECLASSIFICATIONS | ---- | ------------ | --------- | 10207039 | 20006056 | ----- |

A

Ernst & Young - microKOSTPAK SYSTEM VERSION 96 PROVIDER NO. : 41-0007 RUN DATE: 06-27-2002
RHODE ISLAND HOSPITAL FROM-TO : 10/01/1998 - 09/30/1999
VERSION 96.40

HOSPITAL AND HOSPITAL HEALTH CARE COMPLEX COST REPORT CERTIFICATION AND SETTLEMENT SUMMARY
SUBMITTED IN LIEU OF HCFA-2552-96
WORKSHEET S, PART II

| PART II - SETTLEMENT SUMMARY | | Title V | Title XVIII | | Title XIX |
|---|---|---|---|---|---|
| | | | PART A | PART B | |
| | | 1 | 2 | 3 | 4 |
| 1. | Hospital | 0 | 1971594 | 446989 | 0 |
| 2. | Subprovider | 0 | 258816 | 0 | 0 |
| 3. | Swing bed - SNF | 0 | 0 | 0 | 0 |
| 4. | Swing bed - NF | 0 | ---------- | ---------- | 0 |
| 100. | TOTAL | 0 | 2230410 | 446989 | 0 |

The above amounts represent "due to" or "due from" the applicable Program for the element of the above complex indicated.

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-0050. The time required to complete this information collection is estimated to average 657 hours per response, including the time to review instructions, search existing resources, gather the data needed, and complete and review the information collection. If you have any comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: Health Care Financing Administration, 7500 Security Boulevard, N2-14-26, Baltimore, Maryland 21244-1850, and to the Office of the Information and Regulatory Affairs, Office of Management and Budget, Washington D.C. 20503.

Scheduls B

Ernst & Young - microKOSTPAK VERSION 96 PROVIDER NO : 41-0007 RUN DATE: 06-27-2002
RHODE ISLAND HOSPITAL FROM-TO : 10/01/1998 - 09/30/1999
VERSION 96.40

RECLASSIFICATIONS
SUBMITTED IN LIEU OF HCFA-2552-96
WORKSHEET A-6

| | EXPLANATION OF RECLASSIFICATION(S) | CODE (1) 1 | INCREASES COST CENTER 2 | LINE NO. 3 | SALARY 4 | OTHER 5 | Wkst. A-7 Ref. 10 |
|---|---|---|---|---|---|---|---|
| 1. | | A | Operation Of Plant | 8. | 0 | 265275 | 0 |
| 2. | | A | Respiratory Therapy | 49. | 0 | 156 | 0 |
| 3. | Blood Bank Reclass | B | Blood Storing, Processing & Trans. | 47. | 894768 | 4744251 | 0 |
| 4. | Payroll Billed | C | PAYROLL BILLED | 99.07 | 5 | 0 | 0 |
| 5. | | C | CO-OPERATIVE CARE - GENERAL | 19. | 5 | 0 | 0 |
| 6. | | C | Kidney Acquisition | 83 | 5 | 0 | 0 |
| 7 | | C | Operating Room | 37. | 5 | 0 | 0 |
| 8. | | C | Radiology-Therapeutic | 42. | 7 | 0 | 0 |
| 9. | Cafeteria | D | Cafeteria | 12. | 1542318 | 1377931 | 0 |
| 10. | Interest Expense | E | Old Cap Rel Costs-Bldg & Fixt | 1. | 0 | 2989761 | 9 |
| 11. | | E | Old Cap Rel Costs-Mvble Equip | 2. | 0 | 1110021 | 9 |
| 12. | | E | New Cap Rel Costs-Bldg & Fixt | 3 | 0 | 4666051 | 9 |
| 13. | | E | New Cap Rel Costs-Mvble Equip | 4. | 0 | 3021130 | 9 |
| 14. | Bond Amortization | F | Old Cap Rel Costs-Bldg & Fixt | 1. | 0 | 40302 | 9 |
| 15. | | F | Old Cap Rel Costs-Mvble Equip | 2. | 0 | 14963 | 9 |
| 16 | | F | New Cap Rel Costs-Bldg & Fixt | 3. | 0 | 38348 | 9 |
| 17. | | F | New Cap Rel Costs-Mvble Equip | 4. | 0 | 24829 | 9 |
| 18. | Physician Reclass Admin | G | I&R Services-Other Prgm Costs Apprvd | 23. | 0 | 3052 | 0 |
| 19. | | G | Research | 97. | 0 | 1083 | 0 |
| 20. | CDC | H | I&R Services-Other Prgm Costs Apprvd | 23. | 0 | 37748 | 0 |
| 21. | | H | OTHER NON-REIMBURSEABLE | 99.11 | 0 | 4735 | 0 |
| 22. | | H | Research | 97. | 0 | 73143 | 0 |
| 23. | Emergency | I | I&R Services-Other Prgm Costs Apprvd | 23. | 0 | 382502 | 0 |
| 24. | | I | OTHER NON-REIMBURSEABLE | 99.11 | 0 | 65033 | 0 |
| 25. | | I | Research | 97. | 0 | 245838 | 0 |
| 26. | Neurology | J | I&R Services-Other Prgm Costs Apprvd | 23. | 0 | 199050 | 0 |
| 27. | | J | OTHER NON-REIMBURSEABLE | 99.11 | 0 | 7038 | 0 |
| 28. | | J | Research | 97. | 0 | 151259 | 0 |
| 29. | Pathology | K | I&R Services-Other Prgm Costs Apprvd | 23. | 0 | 179888 | 0 |
| 29.01 | | K | OTHER NON-REIMBURSEABLE | 99.11 | 0 | 7488 | 0 |
| 29.02 | | K | Research | 97. | 0 | 156617 | 0 |
| 29.03 | Anesthesia | L | I&R Services-Other Prgm Costs Apprvd | 23. | 0 | 18667 | 0 |
| 29.04 | Radiology | M | I&R Services-Salary & Fringes Apprvd | 22. | 0 | 51041 | 0 |
| 29.05 | | M | OTHER NON-REIMBURSEABLE | 99.11 | 0 | 7576 | 0 |
| 29.06 | | M | Research | 97. | 0 | 9337 | 0 |
| 29.07 | Radiology Ther | N | I&R Services-Other Prgm Costs Apprvd | 23. | 0 | 55741 | 0 |
| 29.08 | | N | OTHER NON-REIMBURSEABLE | 99.11 | 0 | 6316 | 0 |
| 29.09 | | N | Research | 97. | 0 | 27068 | 0 |
| 29.10 | Phys Pri Office | O | Physicians' Private Offices | 98. | 0 | 10000 | 0 |
| 29.11 | Neurology | P | Electroencephalography | 54. | 0 | 12816 | 0 |
| 36. | TOTAL RECLASSIFICATIONS (sum of columns 4 and 5 must equal sum of columns 8 and 9) | ---- | ---------- | ----- | 2437113 | 20006056 | |

(1) A letter (A,B,etc.) must be entered on each line to identify each reclassification entry. Transfer the amounts in column 4,5,8, and 9 to Worksheet A, column 4, lines as appropriate. See instructions for column 10 referencing to Worksheet A-7, Part III, columns 9 through 14.

B

Ernst & Young - microKOSTPAK VERSION 96 PROVIDER NO : 41-0007 RUN DATE: 06-27-2002
RHODE ISLAND HOSPITAL FROM-TO : 10/01/1998 - 09/30/1999
VERSION 96.40

RECLASSIFICATIONS
SUBMITTED IN LIEU OF HCFA-2552-96
WORKSHEET A-6

| | EXPLANATION OF RECLASSIFICATION(S) | CODE (1) 1 | DECREASES COST CENTER 6 | LINE NO. 7 | SALARY 8 | OTHER 9 | Wkst. A-7 Ref. 10 |
|---|---|---|---|---|---|---|---|
| 1. | W & I ADJUSTMENT | A | Old Cap Rel Costs-Bldg & Fixt | 1. | 0 | 265207 | 9 |
| 2. | | A | OTHER ADMINISTRATIVE AND GENERAL | 6.06 | 0 | 144 | 0 |
| 3. | Blood Bank Reclass | B | Laboratory | 44. | 894768 | 4744253 | 0 |
| 4. | Payroll Billed | C | PURCHASING | 6.03 | 1 | 0 | 0 |
| 5. | | C | OTHER ADMINISTRATIVE AND GENERAL | 6.06 | 1 | 0 | 0 |
| 6. | | C | Dietary | 11. | 1 | 0 | 0 |
| 7. | | C | Nursing Administration | 14. | 1 | 0 | 0 |
| 8. | | C | Pharmacy | 16. | 1 | 0 | 0 |
| 9. | | C | DEPARTMENT OF MEDICINE | 19.02 | 1 | 0 | 0 |
| 10. | | C | DEPARTMENT OF SURGERY | 19.03 | 1 | 0 | 0 |
| 11. | | C | DEPARTMENT OF PEDIATRICS | 19.04 | 1 | 0 | 0 |
| 12. | | C | DEPARTMENT OF ORTHOPEDICS | 19.05 | 1 | 0 | 0 |
| 13. | | C | DEPARTMENT OF PSYCHIATRY | 19.06 | 1 | 0 | 0 |
| 14. | | C | DEPARTMENT OF CARDIOLOGY | 19.08 | 1 | 0 | 0 |
| 15. | | C | I&R Services Salary & Fringes Apprvd | 22. | 1 | 0 | 0 |
| 16. | | C | I&R Services Other Prgm Costs Apprvd | 23. | 1 | 0 | 0 |
| 17. | | C | Intensive Care Unit | 26. | 1 | 0 | 0 |
| 18. | | C | PULMONARY FUNCTION TESTING | 37.02 | 1 | 0 | 0 |
| 19. | | C | Radiology-Diagnostic | 41. | 1 | 0 | 0 |
| 20. | | C | Laboratory | 44. | 1 | 0 | 0 |
| 21. | | C | Physical Therapy | 50. | 1 | 0 | 0 |
| 22. | | C | Occupational Therapy | 51. | 1 | 0 | 0 |
| 23. | | C | Speech Pathology | 52. | 1 | 0 | 0 |
| 24. | | C | Electrocardiology | 53. | 1 | 0 | 0 |
| 25. | | C | Clinic | 60. | 1 | 0 | 0 |
| 26. | | C | Emergency | 61. | 1 | 0 | 0 |
| 27. | | C | Research | 97. | 1 | 0 | 0 |
| 28. | | C | Physicians' Private Offices | 98. | 1 | 0 | 0 |
| 29. | | C | OTHER NON-REIMBURSEABLE | 99.11 | 1 | 0 | 0 |
| 29.01 | | C | SNF REHAB | 99.13 | 1 | 0 | 0 |
| 29.02 | Cafeteria | D | Dietary | 11. | 1542318 | 1377931 | 0 |
| 29.03 | Interest Expense | E | Interest Expense | 88. | 0 | 11786963 | 9 |
| 29.04 | Bond Amortization | F | Other Capital Related Costs | 90. | 0 | 118442 | 9 |
| 29.05 | Physician Reclass Admin | G | OTHER ADMINISTRATIVE AND GENERAL | 6.06 | 0 | 4135 | 0 |
| 29.06 | CDC | H | Clinic | 60. | 0 | 115626 | 0 |
| 29.07 | Emergency | I | Emergency | 61. | 0 | 693373 | 0 |
| 29.08 | Neurology | J | Electroencephalography | 54. | 0 | 357347 | 0 |
| 29.09 | Pathology | K | Laboratory | 44. | 0 | 343993 | 0 |
| 29.10 | Anesthesia | L | Operating Room | 37. | 0 | 18667 | 0 |
| 29.11 | Radiology | M | Radiology-Diagnostic | 41. | 0 | 67954 | 0 |
| 29.12 | Radiology Ther | N | Radiology-Therapeutic | 42. | 0 | 89125 | 0 |
| 29.13 | Phys Pri Office | O | DEPARTMENT OF PSYCHIATRY | 19.06 | 0 | 10000 | 0 |
| 29.14 | Neurology | P | Clinic | 60. | 0 | 12816 | 0 |
| 36. | TOTAL RECLASSIFICATIONS | ---- | | --------- | 2437113 | 20006056 | ----- |

B

Ernst & Young - microKOSTPAK SYSTEM VERSION 96
RHODE ISLAND HOSPITAL

PROVIDER NO. : 41-0007

RUN DATE: 06 27-2002
FROM-TO : 10/01/1998 - 09/30/1999
VERSION 96.40

ADJUSTMENTS TO EXPENSES
SUBMITTED IN LIEU OF HCFA-2552-96
WORKSHEET A-8

| | DESCRIPTION (1) | (2) Basis/Code 1 | Amount 2 | Expense Classification on Worksheet A to/from which amount is to be adjusted — Cost Center 3 | Line # 4 | Wkst. A-7 Ref. 5 |
|---|---|---|---|---|---|---|
| 1. | Investment income - Old Bldg & Fixt | | 0 | | | 0 |
| 2. | Investment income - Old Mvble Equip | | n | | | 0 |
| 3. | Investment income - New Bldg & Fixt | | 0 | | | 0 |
| 4. | Investment income - New Mvble Equip | | 0 | | | 0 |
| 5. | Investment income - other | | 0 | | | 0 |
| 6. | Trade, quantity and time discounts | | 0 | | | 0 |
| 7. | Refunds and rebates of expenses | | 0 | | | 0 |
| 8. | Rental of provider space by suppliers | | 0 | | | 0 |
| 9. | Telephone services (pay stat. excl.) | | 0 | | | 0 |
| 10. | Television and radio service | | 0 | | | 0 |
| 11. | Parking lot | | 0 | | | 0 |
| 12. | Provider-based physician adj. | A-8-2 | -1918853 | ------------------------------------ | ------ | 0 |
| 13. | Sale of scrap, waste, etc. | | 0 | | | 0 |
| 14. | Related organization transactions | A 8 1 | -6050947 | ------------------------------------ | ------ | 0 |
| 15. | Laundry and linen service | | 0 | | | 0 |
| 16. | Cafeteria--employees and guests | A | 1683524 | Cafeteria | 12. | 0 |
| 17. | Rental of quarters to employees and others | | 0 | | | 0 |
| 18. | Sale of medical and surgical supplies to other than patients | | 0 | | | 0 |
| 19. | Sale of drugs to other than patients | | 0 | | | 0 |
| 20. | Sale of medical records and abstracts | | 0 | | | 0 |
| 21. | Nursing school (tuition/fees/books/etc.) | | 0 | | | 0 |
| 22. | Vending machines | | 0 | | | 0 |
| 23. | Income from imposition of interest, finance or penalty charges | | 0 | | | 0 |
| 24. | Interest exp. on M'care overpaymts & borrowings to repay M'care overpaymts | | 0 | | | 0 |
| 25. | Adj. for respiratory therapy costs in excess of limitation | A-8-3/ A-8-4 | 0 | Respiratory Therapy | 49. | -- |
| 26. | Adj. for physical therapy costs in excess of limitation (chapter 14) | A-8-3/ A 8-4 | 0 | Physical Therapy | 50. | -- |
| 28. | Utilization review--physicians' compensation | | 0 | Utilization Review-SNF | 69. | -- |
| 29. | Depreciation Old Bldg & Fixt | | 0 | | | 0 |
| 30. | Depreciation--Old Mvble Equip | | 0 | | | 0 |
| 31. | Depreciation--New Bldg & Fixt | | 0 | | | 0 |
| 32. | Depreciation--New Mvble Equip | | 0 | | | 0 |
| 33. | Non-physician Anesthetist | | 0 | Nonphysician Anesthetists | 20. | -- |
| 34. | Physicians' assistant | | 0 | | | 0 |

Ernst & Young - microKOSTPAK SYSTEM VERSION 96 PROVIDER NO. : 41-0007 RUN DATE: 06-27-2002
RHODE ISLAND HOSPITAL FROM-TO : 10/01/1998 - 09/30/1999
VERSION 96.40

ADJUSTMENTS TO EXPENSES
SUBMITTED IN LIEU OF HCFA-2552-96
WORKSHEET A-8

| | DESCRIPTION (1) | (2) Basis/Code 1 | Amount 2 | Expense Classification on Worksheet A to/from which amount is to be adjusted: Cost Center 3 | Line # 4 | Wkst. A-7 Ref. 5 |
|---|---|---|---|---|---|---|
| 35. | Adj. for occupational therapy costs in excess of limitation | A-8-4 | 0 | Occupational Therapy | 51. | -- |
| 36. | Adj. for speech pathology costs in excess of limitation (chapter 14) | A-8-4 | 0 | Speech Pathology | 52. | -- |
| 37. | Affiliation Reimb | B | -1300102 | I&R Services Salary & Fringes Apprvd | 22. | 0 |
| 37.01 | Dietary Revenue | B | -682790 | Dietary | 11. | 0 |
| 37.02 | Misc Revenue-Purchase Discount | B | -114225 | PURCHASING | 6.03 | 0 |
| 37.03 | Misc Revenue-Admin & General | B | -74269 | OTHER ADMINISTRATIVE AND GENERAL | 6.06 | 0 |
| 37.04 | Misc Revenue-Fac. Mgt | B | 12706 | Maintenance & Repairs | 7. | 0 |
| 37.05 | Misc Revenue-Waste Disposal | B | -1267920 | Operation Of Plant | 8. | 0 |
| 37.06 | Misc Revenue-Laundry | B | 2128 | Laundry & Linen Service | 9. | 0 |
| 37.07 | Misc Revenue-Dietary Patient C | B | -20858 | Dietary | 11. | 0 |
| 37.08 | Misc Revenue-Dietary Retail Ca | B | -310649 | Cafeteria | 12. | 0 |
| 37.09 | Misc Revenue-Pharmacy | B | -46 | Pharmacy | 16. | 0 |
| 37.10 | Misc Revenue-Medical Records | B | -147505 | Medical Records & Library | 17. | 0 |
| 37.11 | Misc Revenue-Central Transport | B | -600 | CENTRAL TRANSPORTATION | 19.01 | 0 |
| 37.12 | Misc Revenue-Pediatrics | B | 35 | DEPARTMENT OF PEDIATRICS | 19.04 | 0 |
| 37.13 | Misc Revenue-Psych Partial Hos | B | -34650 | DEPARTMENT OF PSYCHIATRY | 19.06 | 0 |
| 37.14 | Misc Revenue-Student Techs | B | 21559 | PARAMED ED PRGM - TECHNICIANS | 24.01 | 0 |
| 37.15 | Misc Revenue-Pulmonary Lab | B | 1387 | PULMONARY FUNCTION TESTING | 37.02 | 0 |
| 37.16 | Misc Revenue-Diag Radiology | B | -256 | Radiology Diagnostic | 41. | 0 |
| 37.17 | Misc Revenue Ther Radiology | B | -80 | Radiology-Therapeutic | 42. | 0 |
| 37.18 | Misc Revenue-Nuclear Cardiolog | B | -17902 | Radioisotope | 43. | 0 |
| 37.19 | Misc Revenue-Ultrasound | B | 475 | ULTRASOUND | 43.01 | 0 |
| 37.20 | Misc Revenue-MRI Network | B | -941 | MAGNETIC RESONANCE IMAGING(MRI) | 43.03 | 0 |
| 37.21 | Misc Revenue-W&I Oxygen | B | -43876 | Respiratory Therapy | 49. | 0 |
| 37.22 | Misc Revenue-Phys Therapy | B | 576 | Physical Therapy | 50. | 0 |
| 37.23 | Misc Revenue-Speech Pathology | B | -4702 | Speech Pathology | 52. | 0 |
| 37.24 | Misc Revenue-EKC | B | 12401 | Electrocardiology | 53. | 0 |
| 37.25 | Misc Revenue-EEG | B | 6000 | Electroencephalography | 54. | 0 |
| 37.26 | Misc Revenue-Vas Lab | B | -3995 | VASCULAR LAB | 59. | 0 |
| 37.27 | Misc Revenue-Primary Care | B | 125 | Clinic | 60. | 0 |
| 37.28 | Misc Revenue-Emergency Room | B | -42 | Emergency | 61. | 0 |
| 37.29 | Gerry House Rental | B | -1715 | New Cap Rel Costs-Bldg & Fixt | 3. | 9 |
| 37.30 | Gerry House Rental | B | -520 | Old Cap Rel Costs-Bldg & Fixt | 1. | 9 |
| 37.31 | Gerry House Rental | B | -10862 | Maintenance Of Personnel | 13. | 0 |
| 37.32 | RIHTNB Income Rent | B | -608 | Old Cap Rel Costs-Bldg & Fixt | 1. | 9 |
| 37.33 | RIHTNB Income Rent | B | 588 | New Cap Rel Costs-Bldg & Fixt | 3. | 9 |
| 37.34 | RIHTNB Income Rent | B | 2735 | Operation Of Plant | 8. | 0 |
| 37.35 | Steere House Rental | B | -54167 | Operation Of Plant | 8. | 0 |

B

Ernst & Young - microKOSTPAK SYSTEM VERSION 96 PROVIDER NO. : 41-0007 RUN DATE: 06-27-2002
RHODE ISLAND HOSPITAL FROM TO : 10/01/1998 - 09/30/1999
VERSION 96.40

ADJUSTMENTS TO EXPENSES
SUBMITTED IN LIEU OF HCFA-2552-96
WORKSHEET A-8

| DESCRIPTION (1) | (2) Basis/Code 1 | Amount 2 | Expense Classification on Worksheet A to/from which amount is to be adjusted — Cost Center 3 | Line # 4 | Wkst. A-7 Ref. 5 |
|---|---|---|---|---|---|
| 37.36 APC Rental | B | -130786 | Operation Of Plant | 8. | 0 |
| 37.37 Au Bon Pain Rental | B | -83333 | Operation Of Plant | 8. | 0 |
| 37.38 N. E. Organ Bank Rental | B | -5604 | Old Cap Rel Costs Bldg & Fixt | 1. | 9 |
| 37.39 Davol-Bayside Rental | B | -119176 | Operation Of Plant | 8. | 0 |
| 37.40 Misc Rental Income | B | 27709 | Operation Of Plant | 8. | 0 |
| 37.41 Misc Rental Income | B | -238 | Laundry & Linen Service | 9. | 0 |
| 37.42 Non Allowable Hearing Aids | A | 68927 | Speech Pathology | 52. | 0 |
| 37.43 Non Allowable Ambulance Servic | A | 2750 | Emergency | 61. | 0 |
| 37.44 Pension Overfunding | A | -2357710 | Employee Benefits | 5. | 0 |
| 37.45 Investment Income-Old Capital | A | -342612 | Old Cap Rel Costs-Bldg & Fixt | 1. | 9 |
| 37.46 Investment Income-Old Capital | A | -127203 | Old Cap Rel Costs-Mvble Equip | 2. | 9 |
| 37.47 Investment Income-New Capital | A | -309037 | New Cap Rel Costs-Bldg & Fixt | 3. | 9 |
| 37.48 Investment Income-New Capital | A | 211255 | New Cap Rel Costs-Mvble Equip | 4. | 9 |
| 37.49 Recalculation of Startup Amort | A | 124592 | OTHER ADMINISTRATIVE AND GENERAL | 6.06 | 0 |
| 37.50 Recalculation of useful Life-1 | A | 115081 | Old Cap Rel Costs-Bldg & Fixt | 1. | 9 |
| 37.51 Recalculation of useful life-1 | A | 733741 | Old Cap Rel Costs-Bldg & Fixt | 1. | 9 |
| 37.52 Recalculation of useful life-1 | A | -2938 | Old Cap Rel Costs-Bldg & Fixt | 1. | 9 |
| 37.53 Recalculation of useful life-1 | A | -199450 | Old Cap Rel Costs-Bldg & Fixt | 1. | 9 |
| 37.54 Amortization of reorganization | A | 248266 | OTHER ADMINISTRATIVE AND GENERAL | 6.06 | 0 |
| 37.55 Physcian Fee Disallowance | B | -100000 | OTHER ADMINISTRATIVE AND GENERAL | 6.06 | 0 |
| 37.56 Physcian Fee Disallowance | B | -2820 | DEPARTMENT OF MEDICINE | 19.02 | 0 |
| 37.57 Physcian Fee Disallowance | B | -128452 | DEPARTMENT OF SURGERY | 19.03 | 0 |
| 37.58 Physcian Fee Disallowance | B | -191041 | DEPARTMENT OF PEDIATRICS | 19.04 | 0 |
| 37.59 Physcian Fee Disallowance | B | -3825 | I&R Services-Other Prgm Costs Apprvd | 23. | 0 |
| 37.60 Physcian Fee Disallowance | B | -85 | Radiology-Therapeutic | 42. | 0 |
| 37.61 Physcian Fee Disallowance | B | -774219 | Clinic | 60. | 0 |
| 37.62 Physcian Fee Disallowance | B | -12 | Kidney Acquisition | 83. | 0 |
| 37.63 Non Physician Provider | A | -227468 | DEPARTMENT OF MEDICINE | 19.02 | 0 |
| 37.64 Non Physician Provider Fringe | A | -56867 | Employee Benefits | 5. | 0 |
| 37.65 Non Physician Provider | A | -703559 | DEPARTMENT OF SURGERY | 19.03 | 0 |
| 37.66 Non Physician Provider Fringe | A | -175890 | Employee Benefits | 5. | 0 |
| 37.67 Non Physician Provider | A | -33830 | DEPARTMENT OF PEDIATRICS | 19.04 | 0 |
| 37.68 Non Physician Provider Fringe | A | -8458 | Employee Benefits | 5. | 0 |
| 37.69 Non Physician Provider | A | -37255 | Operating Room | 37. | 0 |
| 37.70 Non Physician Provider Fringe | A | -9314 | Employee Benefits | 5. | 0 |
| 37.71 Non Physician Provider | A | -301294 | Clinic | 60. | 0 |
| 37.72 Non Physician Provider Fringe | A | -75324 | Employee Benefits | 5. | 0 |
| 37.73 Payroll Billed | A | -6997 | PURCHASING | 6.03 | 0 |
| 37.74 Payroll Billed | A | -16533 | OTHER ADMINISTRATIVE AND GENERAL | 6.06 | 0 |
| 37.75 Payroll Billed | A | -19195 | Dietary | 11. | 0 |

B

Ernst & Young - microKOSTPAK SYSTEM VERSION 96 PROVIDER NO. : 41-0007 RUN DATE: 06-27-2002
RHODE ISLAND HOSPITAL FROM-TO : 10/01/1998 - 09/30/1999
VERSION 96.40

ADJUSTMENTS TO EXPENSES
SUBMITTED IN LIEU OF HCFA-2552 96
WORKSHEET A 8

| DESCRIPTION (1) | (2) Basis/Code 1 | Amount 2 | Expense Classification on Worksheet A to/from which amount is to be adjusted: Cost Center 3 | Line # 4 | Wkst. A-7 Ref. 5 |
|---|---|---|---|---|---|
| 37.76 Payroll Billed | A | 705100 | Nursing Administration | 14. | 0 |
| 37.77 Payroll Billed | A | -14939 | Pharmacy | 16. | 0 |
| 37.78 Payroll Billed | A | -137171 | DEPARTMENT OF MEDICINE | 19.02 | 0 |
| 37.79 Payroll Billed | A | -117264 | DEPARTMENT OF SURGERY | 19.03 | 0 |
| 37.80 Payroll Billed | A | -1662115 | DEPARTMENT OF PEDIATRICS | 19.04 | 0 |
| 37.81 Payroll Billed | A | -39097 | DEPARTMENT OF ORTHOPEDICS | 19.05 | 0 |
| 37.82 Payroll Billed | A | -335526 | DEPARTMENT OF PSYCHIATRY | 19.06 | 0 |
| 37.83 Payroll Billed | A | -6553 | DEPARTMENT OF CARDIOLOGY | 19.08 | 0 |
| 37.84 Payroll Billed | A | -1138005 | I&R Services-Salary & Fringes Apprvd | 22. | 0 |
| 37.85 Payroll Billed | A | -2882376 | I&R Services-Other Prgm Costs Apprvd | 23. | 0 |
| 37.86 Payroll Billed | A | -25805 | Intensive Care Unit | 26. | 0 |
| 37.87 Payroll Billed | A | -21600 | PULMONARY FUNCTION TESTING | 37.02 | 0 |
| 37.88 Payroll Billed | A | -2200 | Radiology-Diagnostic | 41. | 0 |
| 37.89 Payroll Billed | A | -6808 | Laboratory | 44. | 0 |
| 37.90 Payroll Billed | A | -156594 | Physical Therapy | 50. | 0 |
| 37.91 Payroll Billed | A | -9547 | Occupational Therapy | 51. | 0 |
| 37.92 Payroll Billed | A | -794 | Speech Pathology | 52. | 0 |
| 37.93 Payroll Billed | A | -1069 | Electrocardiology | 53. | 0 |
| 37.94 Payroll Billed | A | -126328 | Clinic | 60. | 0 |
| 37.95 Payroll Billed | A | -109874 | Emergency | 61. | 0 |
| 37.96 Payroll Billed | A | -5394 | Research | 97. | 0 |
| 37.97 Payroll Billed | A | -16335 | Physicians' Private Offices | 98. | 0 |
| 50. TOTAL (sum of lines 1 thru 49) (Transfer to Wkst. A, col 6, line 101) | --------- | -20631707 | | | |

(1) Description--all chapter references in this column pertain to HCFA Pub. 15-I
(2) Basis for adjustment (SEE INSTRUCTIONS).
A. Costs -- if cost, including applicable overhead, can be determined.
B. Amount Received -- if cost cannot be determined.
(3) Additional adjustments may be made on lines 35 thru 49 and subscripts thereof.

B